*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0274P (6th Cir.)
File Name: 02a0274p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

HAROLD E. STEELE; DON
PETERSON; Rev. DAVID
MAYNARD; HARMON WRAY;
Rev. TOM BAKER, JR.,
      *Plaintiffs-Appellees,*

      *v.*

INDUSTRIAL DEVELOPMENT
BOARD OF METROPOLITAN
GOVERNMENT NASHVILLE
(00-6648); METROPOLITAN
GOVERNMENT OF NASHVILLE
(00-6646); DAVID LIPSCOMB
UNIVERSITY (00-6647);
NATIONSBANK (00-6649);
NATIONSBANK/TENNESSEE
(00-6649),
      *Defendants-Appellants.*

Nos. 00-6646/
6647/6648/6649

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 91-00421—Aleta A. Trauger, District Judge.

Argued: February 1, 2002

Decided and Filed:  August 14, 2002

Before:  NORRIS and CLAY, Circuit Judges; SARGUS,
District Judge.

_____

**COUNSEL**

**ARGUED:**    James L. Charles, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, Bradley A. MacLean, STITES & HARBISON, Nashville, Tennessee, for Appellants.  David Randolph Smith, DAVID RANDOLPH SMITH & ASSOCIATES, Nashville, Tennessee, for Appellees.  **ON BRIEF:** James L. Charles, Amber K. St. John, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, Bradley A. MacLean, Stephen H. Price, Alexandra T. MacKay, STITES & HARBISON, Nashville, Tennessee, Bobby D. Davis, DAVIS & BAGGOTT, Madison, Tennessee, Robert J. Warner, Jr., WATKINS, McGUGIN, McNEILLY & ROWAN, Nashville, Tennessee, for Appellants.  David Randolph Smith, DAVID RANDOLPH SMITH & ASSOCIATES, Nashville, Tennessee, Joseph Howell Johnston, Nashville, Tennessee, for Appellees. Betty Lee Dunkum, CHRISTIAN LEGAL SOCIETY, Annandale, Virginia, Nathan A. Adams IV, L. Martin Nussbaum, ROTHGERBER, JOHNSON & LYONS, Colorado Springs, Colorado, Lee Boothby, BOOTHBY & YINGST, Washington, D.C., Lowell V. Sturgill, Jr., Robert M. Loeb, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amici Curiae.

   SARGUS, D. J., delivered the opinion of the court, in which NORRIS, J., joined.  CLAY, J. (pp. 30-74), delivered a separate dissenting opinion.

_____

[*] The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of Ohio, sitting by designation.

**CONCLUSION**

Based upon the foregoing, I would **AFFIRM** the district court's order granting Plaintiffs' motion for summary judgment, denying Defendants' motions for summary judgment, and entering a permanent injunction prohibiting the Board and Metro from issuing additional tax-exempt bonds to Lipscomb or tax-exempt bonds to any pervasively sectarian institution.

_____

**OPINION**

_____

SARGUS, District Judge. Defendants have appealed the district court's order granting summary judgment to Plaintiffs and issuing a permanent injunction prohibiting the Industrial Development Board ("Board") and the Metropolitan Government ("Metro") from issuing additional tax-exempt bonds to David Lipscomb University ("Lipscomb University") or bonds to any other pervasively sectarian institution. (J.A. 1027-28). Metro and Lipscomb University also appeal the court's denial of their separate motions for summary judgment. For the reasons that follow, we REVERSE the district court's grant of summary judgment for plaintiffs and REVERSE the district court's denial of summary judgment as to Metro and Lipscomb University.

**I. BACKGROUND**

The background of this case is well set forth by the district court which described Lipscomb University and its redevelopment project as follows:

David Lipscomb University, founded in 1891, describes itself as a "liberal arts university." It is located in Nashville, Tennessee, and has an enrollment of approximately 2,500 students. It is affiliated with the Churches of Christ, and its primary mission has been to integrate Christian faith and practice with the pursuit of academic excellence.

During the early 1990s, Lipscomb undertook a major redevelopment project on its campus. To finance the project, Lipscomb sought a $15 million, low- interest loan from the Industrial Development Board. The Industrial Development Board approved the loan and financed it by issuing tax-exempt industrial development bonds worth $15 million.

*Steele v. Indus. Dev. Bd. of the Metro. Gov't of Nashville and Davidson County*, 117 F. Supp.2d 693, 694 (M.D. Tenn. 2000).

The district court then described the bonds the Board issued to Lipscomb University as those "typical of industrial revenue bonds that are commonly issued for educational or industrial purposes." The Board issued the bonds pursuant to its authority under state law for the financing of projects for "[a]ny nonprofit educational institution in any manner related to or in furtherance of the educational purposes of such institution, including but not limited to classroom, laboratory, housing, administrative, physical education, and medical research and treatment facilities." Tenn. Code Ann. § 7-53-101(11)(A)(vii) (1990 Supp.).

This case was filed in the district court on May 30, 1991, challenging the validity of the Board's action in issuing the tax-exempt revenue bonds for the benefit of Lipscomb University. The plaintiffs are state and local taxpayers residing in the Nashville area. They contend that the issuance of tax-exempt revenue bonds for Lipscomb University provides an impermissible benefit to a pervasively sectarian institution, thereby violating the Establishment Clause of the First Amendment to the United States Constitution. Such aid, they argue, has the impermissible effect of advancing religion because a substantial portion of Lipscomb University's functions are subsumed in its religious mission. The plaintiff's objected to the issuance of the bonds on this basis at public hearings and meetings of the Board on April 16, 1990, May 30, 1990, and January 22, 1991. The decision was made to issue the bonds, which is the basis of this case.

As to the ability of the plaintiffs to bring this suit, the district court explained that the plaintiffs were found to have standing to bring this suit as municipal taxpayers who have an interest in preventing their local government from subsidizing religious institutions. The plaintiffs argued that tax dollars were being expended on behalf of a pervasively religious

religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. A program that shares these features permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients. The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.

*Id*. at 2467.

The situation is quite different, though, when the government aid program provides a direct economic benefit to a pervasively religious educational institution and thereby advances its religious objectives. For unlike state aid to individual recipients who choose to advance the religious mission of an educational institution, the government's role does not end with the disbursement of benefits when economic aid is made directly to a pervasively religious educational institution, such as Lipscomb. In the case of a pervasively sectarian educational institution, such direct economic aid by the state is, by definition, inextricably intertwined with the religious mission of the school so as to establish that the government is endorsing the sectarian character of the institution in violation of the Establishment Clause of the United States Constitution. To permit such state aid to a pervasively sectarian educational institution does not merely "remove a brick from the wall that was designed to separate religion and government," *Zelman* , 122 S. Ct. at 2485 (Stevens, J. dissenting opinion); it leaves a gaping hole in the wall separating church and state.

*College I,* 159 F.3d at 158 (citing *Roemer*, 426 U.S. at 758 n. 21.) So even though the loan agreement explicitly prohibits Lipscomb from using any bond-financed facilities for religious purposes, there is no way to prevent that from happening here because of the University's pervasively religious character. Since the sectarian and secular activities at Lipscomb are so inextricably intertwined, the government cannot avoid excessive entanglement with the sectarian mission of the University. *Agostini*, 521 U.S. at 234. Accordingly, the low-interest loan arranged by the Board through the issuance of the tax-exempt revenue bonds to Lipscomb results in a violation of the Establishment Clause. Indeed, it is not at all clear that Lipscomb would have been able to proceed with its construction and renovation project without the issuance of the tax-exempt revenue bonds; certainly, the record indicates that it would not have been possible to proceed on such financially favorable terms.

The Supreme Court's recent decision in *Zelman,* 122 S. Ct. at 2460, does not alter this conclusion, but indeed supports it. As noted by the Court in *Zelman*, "our decisions have drawn a consistent distinction between government programs that provide aid directly to religious schools . . . and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals." *Id.* at 2465 (citations omitted.).[5] The Court added:

> *Mueller* [*v. Allen*, 463 U.S. 388 (1983)], *Witters* [*v. Washington Dept. of Servs. for Blind*, 474 U.S. 481 (1986)], and *Zobrest* [v. *Catalina Foothills School Dist.*, 509 U.S. 1 (1993)] thus make clear that where a government aid program is neutral with respect to

---

[5] The majority opinion runs this distinction together, citing in footnote three cases involving government aid provided directly to religious schools with those involving government aid that reaches religious schools through individuals.

institution because the tax base of the state and local governments was reduced by the tax-exempt bonds. They asserted that, if tax-exempt bonds had not been issued, Lipscomb University would have financed all or part of the project through taxable bonds, which would have provided significant revenue for the city coffers.

The tax exempt bonds do not constitute an indebtedness of either the Board or the Metropolitan Government. Neither the Board nor the Metropolitan Government can be held liable to pay any portion of the principal or interest on the bonds or any costs incident to their issuance. TENN. CODE ANN. § 7-53-306 (1985). No state or local government tax revenues have been or will be spent as a result of the issuance of the bonds.

The district judge originally assigned to this case found that, even if no tax money is spent, taxpayer status is proper grounds for an Establishment Clause challenge to policies that affect the city's general revenue fund. Summary judgment was denied on those grounds and, on interlocutory appeal, the Sixth Circuit Court of Appeals upheld the district court's decision as to standing. *Steele v. Indus. Dev. Bd. of the Metro. Gov't of Nashville and Davidson County,* 39 F.3d 1182 (6th Cir.1994) (unpublished table decision), *cert. denied,* 515 U.S. 1121, 115 S.Ct. 2275, 132 L.Ed.2d 279 (1995).

With regard to the mechanics of the bonds at issue, the district court's decision again provides a thorough summary:

> Under 26 U.S.C. § 103 [Internal Revenue Code], gross income does not include interest on any state or local bonds that are both private activity bonds and qualified under 26 U.S.C. § 141. *See* 26 U.S.C. § 103(a)(b)(1) (1994). A private activity bond is defined, in relevant part, under 26 U.S.C. § 141 as any bond that is part of an issue which meets the "private loan financing test." 26 U.S.C. § 141(a)(2) (1994). The "private loan financing test" is met where "the amount of the proceeds of the issue which are to be used (directly or indirectly) to make

or finance loans ... to persons other than governmental units exceeds the lesser of (A) 5 percent of such proceeds, or (B) $5,000,000." 26 U.S.C. § 141(c)(1) (1994).

In order for the interest on the bonds to be exempt from federal taxation, the private activity bonds must also be qualified under 26 U.S.C. § 141(e) (1994). There are three criteria that a bond issuance must meet under this section. First, the bond must fall within one of the enumerated categories: "(A) an exempt facility bond, (B) a qualified mortgage bond, (C) a qualified veterans' mortgage bond, (D) a qualified small issue bond, (E) a qualified student loan bond, (F) a qualified redevelopment bond, or (G) a qualified 501(c)(3) bond." 26 U.S.C. § 141(e)(1) (1994). Second, the bond issue must meet the volume cap requirements of section 146. 26 U.S.C. § 141(e)(2) (1994); *see also* 26 U.S.C. § 146 (1994). Finally, the bond issue must meet the requirements of each applicable subsection of section 147. 26 U.S.C. § 141(e)(3) (1994). Under the public approval requirement of section 147(f), in order to be a qualified bond a private activity bond *must be approved by both the governmental unit issuing the bond and the governmental unit that has jurisdiction over the area in which the facility receiving financing through the bond proceeds is located. See* 26 U.S.C. § 147(f)(2)(A) (1994).

A bond that meets each of these criteria will be designated as a qualified private activity bond under 26 U.S.C. § 103. *Where the bonds issued are qualified private activity bonds, the interest from the bonds will be exempt from federal taxation.* 26 U.S.C. § 103 (1994).

*Steele,* 117 F. Supp.2d at 698 (emphasis added).

In the instant case, the bonds were issued for the benefit of Lipscomb University, a private educational institution. The bonds were issued for the purpose of renovating facilities on

religious organizations from taxes, as it would were it to subsidize them. The exemption simply leaves untouched that which adherents of the organization bring into being and maintain.

*Id*. at 693.

Although no state funds were transferred through the revenue-bond financing employed in this case, the form of state aid at issue, however, exhibits the "affirmative involvement characteristic of outright governmental subsidy." *Id*. at 691. Here, the Board and Metro do not play a "passive" role, but rather "affirmatively foster" the activities of Lipscomb by acceding to its request for a low-interest loan funded by tax-exempt revenue bonds. Moreover, the tax-exempt revenue financing does not "simply leave[] untouched that which adherents of the organization bring into being and maintain." *Id*. Instead, the issuance of the low-interest loan to the pervasively sectarian educational institution in this case "employs the organs of government for essentially religious purposes" by allowing Lipscomb to fund improvements to its University in order to advance its sectarian mission. *Id*. By providing a low-interest loan funded by tax-exempt revenue bonds to a pervasively sectarian educational institution, the Board and Metro provided the kind of state aid that is characteristic of a direct governmental subsidy.

Consequently, given Lipscomb's pervasively sectarian character, it must be concluded that Lipscomb's receipt of a direct economic benefit in the form of a low-interest $15 million loan resulted in excessive governmental entanglement with the religious mission of the University. In view of Lipscomb's "character and purposes," *Agostini*, 521 U.S. at 232 (quoting *Lemon*, 403 U.S. at 615), its "secular activities cannot be separated from sectarian ones." *Roemer*, 426 U.S. at 755. Because the religious and secular functions are inseparable at Lipscomb, "no safeguard can ensure that direct monetary aid, even if designated to fund the school's secular functions, will not aid its religious mission." *Columbia*

that a direct economic benefit accrues to such an institution as a result of the government's active participation in arranging for a low-cost loan that enables the institution to advance its sectarian mission.

In view of the government's direct involvement with advancing the religious mission of a pervasively sectarian educational institution, it cannot be said that this form of state aid comes within *Walz v. Tax Comm'n*, 397 U.S. 664 (1970), where the Supreme Court upheld a property tax exemption to religious organizations for properties used solely for religious worship. *See Hunt*, 413 U.S. at 745 n. 7. As noted in the concurring opinion of Justice Brennan in *Walz*, while general subsidies of religious activities would constitute impermissible state involvement with religion, tax exemptions "constitute mere passive state involvement with religion and not the affirmative involvement characteristic of outright government subsidy." *Walz*, 397 U.S. at 690-91. As explained by Justice Brennan:

> Tax exemptions and general subsidies, however, are qualitatively different. Though both provide economic assistance, they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from the taxpayers as a whole. An exemption, on the other hand, involves no such transfer. It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes.

*Id*. (footnotes omitted.) Thus, in finding that the property exemptions in question did not rise to the level of excessive governmental involvement, Justice Brennan noted:

> To the extent that the exemptions further secular ends, they do not advance "essentially religious purposes." To the extent that purely religious activities are benefited by the exemptions, the benefit is passive. Government does not affirmatively foster these activities by exempting

Lipscomb University's campus. This meets the "private loan financing test" of section 141(c) because the entire amount of bond proceeds loaned to Lipscomb University exceeded the statutory minimum loan amount. Therefore, the bonds may be characterized as private activity bonds under 26 U.S.C. § 141(a) (1994). Further, the Loan Agreement between the Board and Lipscomb University specifically prohibits it from using any bond-financed facilities for religious purposes.[1] The bonds in question meet the technical requirements of 26 U.S.C. § 103.

For the bonds to be qualified as tax exempt, they must also meet the criteria under section 141(e). The bonds meet the first criteria for being a qualified private activity bond under section 141(e)(1) because the bonds are qualified 501(c)(3) bonds, which is one of the enumerated categories of bond types under this section. *See* 26 U.S.C. § 141(e)(1) (1994). A qualified 501(c)(3) bond is defined in section 145(a) as a private activity bond where "all property which is to be provided by the net proceeds of the issue is to be owned by a 501(c)(3) organization." 26 U.S.C. § 145(a)(1) (1994). All of the proceeds of the $15,000,000 bond issue were loaned to Lipscomb University for use in building new facilities and in renovating existing facilities. Lipscomb University is a registered 501(c)(3) organization, thereby satisfying this requirement.

---

[1] The Loan Agreement between Lipscomb University and the Board does contain a restrictive use provision. Section 5.3 on "Special Covenants" states:

> (s) The Borrower will not use the Project or any part thereof for sectarian instruction or as a place of religious worship or in connection with any part of the program of a school or department of divinity for any religious denomination or the training of ministers, priests, rabbis or other similar persons in the field of religion.

*Steele*, 117 F. Supp.2d at 727 citing Docket No. 13, attach. Ex. 12 at 18.

The district court summarized the final requirement as to pubic hearing and local approval as follows:

[A] private activity bond will not be a qualified bond unless it meets the subsection's public approval requirement. 26 U.S.C. § 147(f) (1994). This requirement is satisfied where the bond issue has been both (1) approved either by or on behalf of the governmental unit that issued the bonds, and (2) approved by each governmental unit that has jurisdiction over the area where any facilities which are to be financed by the bond proceeds are located. 26 U.S.C. § 147(f)(A) (1994). In each case, the approval must be given by either "the applicable elected representative of such governmental unit after a public hearing following reasonable notice" or by a voter referendum of the governmental unit. 26 U.S.C. § 147(f)(B) (1994). The elected representative may be an elected legislative body of the governmental unit, "the chief elected executive officer, the chief elected State legal officer of the executive branch, or any other elected official of such unit designated for the purposes of this paragraph by such chief elected executive officer or by State law." 26 U.S.C. § 147(f)(2)(E)(i) (1994). *Steele*, 117 F. Supp.2d at 698.[2]

---

[2]The "scope" of the governmental approval is addressed in federal regulations, which state:

An issue is treated as approved if the governmental units ... have approved either - (i) The issue ... not more than one year before the date of issue, or (ii) A plan of financing for each facility financed by the issue pursuant to which the issue in question is timely issued (as required in paragraph (f)(3) of this section). In either case, the scope of the approval is determined by the information, as specified in paragraph (f)(2), contained in the notice of hearing ... and the approval. (2) Information required. A facility is within the scope of an approval if the notice of hearing ... and the approval contain - (i) A general, functional description of the type and use of the facility to be financed ...

fundamental character of the government's participation in this kind of financing arrangement. In this respect, it is important to examine the reasoning of the Virginia Supreme Court in *Lynn,* which found that the governmental aid involved in the revenue-bond financing in that case did not amount to "direct aid" to Regent University, a pervasively sectarian educational institution, because no governmental aid was received by the University since the bond proceeds are funds of private investors. 538 S.E.2d at 638. According to *Lynn*, "Regent receives these funds because of the genuinely independent choices of investors," whose decisions to purchase the bonds "cannot be attributed to state decision making." *Id.* at 639 (citing *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 10 (1993)). Accordingly, the Virginia Supreme Court concluded that there was no Establishment Clause violation because "[n]o government funds ever reach Regent's coffers." *Id.*

What is being ignored in this account is the fact that the government provides the pervasively sectarian educational institution with a direct economic benefit in the form of a low-interest loan, which the institution would not be able to obtain without the direct participation of the government. Thus, although it is true that no state funds are being transferred through this kind of financing mechanism, the relevant question is whether the government has provided the pervasively sectarian educational institution with a direct economic benefit. Contrary to the understanding of the court in *Lynn*, a direct economic benefit is not necessarily determined by merely looking at whether there was a transference of governmental money. To constitute a direct economic benefit to a pervasively sectarian educational institution, it is sufficient that the government makes it possible for the institution to obtain economic aid that it would not otherwise be able to obtain without the government's direct participation. That no governmental funds actually reach the coffers of the pervasively sectarian educational institution does not alter for one moment the fact

lots, landscaping, computer mainframe, baseball stadium, tennis courts, fiber optic network, a pedestrian walkway, and renovate its administration and business school buildings. Through the low-interest loan, Lipscomb was thereby able to improve its facilities to increase its student enrollment to 3,000, and thus advance its sectarian mission.

The district court also properly rejected Defendants' argument that Lipscomb's economic benefit came from the bond purchasers who purchased the tax-exempt revenue bonds, and not from the government. Properly understood, Lipscomb received a direct economic benefit in the form of a low-interest government sponsored loan. For Establishment Clause purposes, it is immaterial that the Board subsequently assigned the loan to Sovran Bank.

The district court also correctly rejected Defendants' argument that the bondholders, not Lipscomb, are the true beneficiaries of the aid program. As the district court properly noted, the Supreme Court in *Hunt* examined a similar transaction and found that "[t]he income tax-exempt status of the interest enables the Authority, as an instrumentality of the State, to market the bonds at a significantly lower rate of interest than the educational institution would be forced to pay if it borrowed the money by conventional private financing." *Steele*, 117 F.Supp.2d at 717 (quoting *Hunt*, 413 U.S. at 739). Thus, the district court rightly concluded that "Lipscomb received a flow of funds into its coffers provided by a loan from the Board. These funds did not merely supplement the teaching of secular subjects at Lipscomb; they were central to the school's stated goal of increasing enrollment. If Lipscomb's mission is to promote Churches of Christ doctrine, then Metro, through the Board, provided aid to promote Churches of Christ doctrine." *Steele*, 117 F. Supp.2d at 718.

It should be pointed out, at this juncture, that characterizing the role of the state as a "mere conduit" on the basis that the use of governmental funds is not involved ignores the

In this case, the bond issue was approved by the Industrial Development Board as the governmental unit that issued the bonds and by Mayor Bill Boner as the chief elected executive officer of Metropolitan Government of Nashville and Davidson County, the governmental unit in which the facilities of Lipscomb University are located.

## II. STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *See Gribcheck v. Runyon*, 245 F.3d 547, 549 (6th Cir. 2001). The standards applicable to such review are well established:

Summary judgment is appropriate where no genuine issue of material fact exists so that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court determines whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Of course, "inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motions." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The movant meets its

---

(ii) The maximum aggregate face amount of obligations to be issued with respect to the facility, (iii) The initial owner, operator, or manager of the facility, (iv) The prospective location of the facility by its street address or, if none, by a general description designed to inform readers of its specific location. ... An approval or notice of public hearing will not be considered to be adequate if any of the items in subdivisions (i) through (iv) of this subparagraph (2), with respect to the facility to be financed, are unknown on the date of the approval or the date of the public notice.

26 C.F.R. § 5f.103-2(f) (1999).

initial burden "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). At that point, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e): *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505.

*Clayton v. Meijer*, Inc., 281 F.3d 605, 609 (6th Cir. 2002) (citation omitted).

## III. ANALYSIS

The issue presented in this appeal is whether the issuance of tax exempt revenue bonds violates the Establishment Clause, if the bonds are for the benefit of an institution found by the district court to be pervasively sectarian.[3] The issue

---

[3] In the following cases, the Supreme Court found government aid programs constitutional: *Mitchell v. Helms*, 530 U.S. 793 (2000) (plurality) (providing educational materials and equipment to religious schools upheld); *Agostini v. Felton*, 521 U.S. 203 (1997) (allowing remedial public school teachers and counselors to assist at religious school); *Rosenberger v. Rector and Visitors of Univ. of Virginia*, 515 U.S. 819 ( 1995) (providing printing facilities for all qualified student publications including religious publication constitutional); *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1 (1993) (providing a sign language interpreter for deaf child in religious secondary school not unconstitutional); *Bowen v. Kendrick*, 487 U.S. 589 (1988) (funding for abstinence-based family planning programs offered by religious social welfare agency found constitutional); *Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481 (1986) (offering vocational education scholarship to visually disabled seminarian not unconstitutional); *Committee for Pub. Educ. and Religious Liberty v. Regan*, 444 U.S. 646 (1980) (reimbursing religious school for performing state-mandated standardized tests and record keeping); *Wolman v. Walter*, 433 U.S. 229 (1977) (providing textbook loans, vocational training, diagnostic services, therapeutic and remedial services, and standardized testing and scoring for religious school); *Roemer v. Bd. of Pub. Works*, 426 U.S. 736 (1976) (subsidizing per-student to a religious college constitutional); *Tilton v. Richardson*, 403 U.S. 672 (1971) (finding construction grants to

receipts from any such facilities and secured by a pledge of said revenues and receipts.

(J.A. at 130-31.) Thus, contrary to the protestations of the Board and Metro, it is clear that because the Board is an instrumentality of Metro, both Defendants were involved in the project benefiting Lipscomb, notwithstanding their separate legal identity. Further, the district court properly rejected Metro's contention that it could not be liable for an Establishment Clause violation in this case because it only provided "host approval" for the bonds to be federally tax exempt. As the district court properly noted, Metro's role in the financing was critical because the bonds could not have been issued as federally tax exempt without Metro's participation in approving the bond issue.

Under the terms of the statute, local governments are authorized to offer low-interest loans by making funds available through the issuance of tax-exempt municipal bonds. Here, Lipscomb approached the Board seeking a low-interest development loan funded by the proceeds of the tax-exempt bond issuance. While the money that went to Lipscomb ultimately came from private investors who purchased the tax-exempt revenue bonds, and while Lipscomb must repay Sovran Bank for the loan, the direct economic benefit that Lipscomb received from the governmental entities, as the district court pointed out, was the low-interest "loan from the Board and, hence, from Metro." *Steele*, 117 F. Supp.2d at 717.

Thus, even though there was no direct transfer of money from the Board to Lipscomb, the district court correctly found that "[t]he money went directly to Lipscomb in the form of a loan from the Board, an instrumentality of Metro." *Id.*, 117 F. Supp.2d at 720. As a result of the low-interest loan of $15 million originated by the Board at Lipscomb's request, Lipscomb thus saved about 30% of the cost of its campus building projects. These savings enabled Lipscomb to fund the new library, intramural sports building and field, parking

providing every religion with an *equal opportunity* (say, to secure state funding or to pray in public schools), but by drawing fairly clear lines of separation between church and state") (emphasis in original). What matters in this case, then, is only whether the state aid provided to Lipscomb, a pervasively sectarian institution, is in violation of the Establishment Clause.

The district court properly concluded that the Establishment Clause was violated because Lipscomb received a direct economic benefit from the government, which resulted in excessive entanglement of the government with the religious institution. Although the district court noted that "[t]here is no single, clear definition of 'direct benefit' to control this analysis," Black's Law Dictionary defines "direct" in the relevant sense as "[i]mmediate; proximate; by the shortest course; without circularity; operating by an immediate connection or relation, instead of operating through a medium; the opposite of *indirect*." Black's Law Dictionary 459 (6th ed. 1990). In contrast, "indirect" is defined as "[n]ot direct in relation or connection; not having an immediate bearing or application; not related in the natural way." *Id*. at 773.

As the district court correctly noted, the Board and Metro were both directly connected to the project benefiting Lipscomb. According to the official statement regarding the issuance of $15 million in educational facilities refunding bonds,

The Issuer [the Board] was created on May 6, 1959 pursuant to the Act as a public corporation and instrumentality of the Metropolitan Government of Nashville and Davidson County, Tennessee, for the purpose, among other things, of financing educational facilities with a view to promoting the education of the people of the State of Tennessee. The Issuer is authorized by the Act to issue revenue bonds, including refunding bonds, payable solely from the revenues and

has not been addressed by other Circuits or by the Supreme Court.[4]

The First Amendment, applicable to the states through the Fourteenth Amendment, provides that "Congress shall make

---

religiously affiliated college constitutional); *Bd. of Educ. v. Allen*, 392 U.S. 236 (1968) (loaning of textbooks for religious school upheld); *Everson v. Bd. of Educ.*, 330 U.S. 1 (1947) (reimbursing parents for bus transportation costs to religious school constitutional); *Cochran v. Louisiana State Bd. of Educ.*, 281 U.S. 370 (1930) (loaning textbooks to religious school constitutional); *Bradfield v. Roberts*, 175 U.S. 291 (1899) (allowing federal funds to build a Catholic hospital constitutional).

[4] Several state courts have addressed the precise issue; all have found that the issuance of industrial revenue bonds is not tantamount to the giving of direct aid to religious schools. *Opinion of the Justices*, 354 Mass. 779, 236 N.E.2d 523, 526, 27 (1968) (concluding that tax-exempt bond financing is not a form of direct assistance to private or religious charitable institutions, as there was no grant or appropriation of public money, no loan of public credit, and the participants bore all costs of the program); *Vermont Educ. Bldgs. Financing Agency v. Mann*, 247 A.2d 68, 72 (Vt. 1968) *app. dism'd*, 396 U.S. 801 (1969) (same); *Nohrr v. Brevard County Educ. Facilities Auth.*, 247 So.2d 304, 307-09 (Fla. 1971) (same); *Cercle v. Ill. Educ. Facilities Auth.*, 288 N.E.2d 399, 401 (Ill. 1972) (same); *Calif. Educ. Facilities Auth. v. Priest*, 526 P.2d 513, 515, 520 (Cal. 1974) (same); *Minn. Higher Educ. Facilities Auth. v. Hawk*, 232 N.W.2d 106, 111 (Minn. 1975); *Washington Higher Educ. Facilities Auth. v. Gardner*, 699 P.2d 1240, 1243, 1245-46 (Wash. 1985) (holding that the tax exempt status did not create a debt or a borrower-lender relationship between the state and the religiously affiliated universities or the bondholders, the bond proceeds never entered the public treasury, repayment did not pass through the public treasury, and no state debt was created); *Cortez v. Independence County*, 698 S.W.2d 291, 292 (Ark. 1985) (concluding that the tax-exempt revenue bonds were not a pledge of public money); *Virginia College Bldg. Auth. v. Lynn*, 538 S.E.2d 682, 698 (Va. 2000) (finding that the aid received from tax-exempt revenue bonds does not involve usage of governmental funds in the traditional sense in which the terms have been used). *See also Durham v. McLeod*, 192 S.E.2d 202, 203-04 (S.C. 1972), *app. dism'd for want of a sub'l fed'l question*, 413 U.S. 902 (1973) (finding that tax-free revenue bonds satisfied solely by student loan payment were neither a state debt nor public money or credit).

no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.   The Supreme Court has consistently held that the Establishment Clause, prohibiting government establishment of religion, and the Free Exercise Clause, prohibiting government restrictions of the free exercise of religion, must function in harmony. *Johnson v. Economic Development Corp.*, 241 F.3d 501, 509 (6th Cir. 2001) *citing Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947); *Walz v. Tax Comm'n*, 397 U.S. 664, 669-70 (1970).

## A.  Pervasively Sectarian Test

The district court concluded that Lipscomb University is a pervasively sectarian institution.  The district court set forth the law governing this analysis as follows:

The pervasively sectarian test is based on the line of cases beginning with *Tilton* [v. Richardson, 403 U.S. 672 (1971)], and extending through *Bowen v. Kendrick*, 487 U.S. 589 (1988).  In *Hunt v. McNair*, the Court found that "aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting." 413 U.S. 734, 743 (1973).  Thus, the rule under the pervasively sectarian test, as stated in *Roemer v. Board of Publ. Works of Maryland*, 426 U.S. 736, 96 S. Ct. 2337, 49 L. Ed. 2d 179 (1976), is that "no state aid at all go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from  sectarian ones . . . . " 426 U.S. at 755.

*Steele*, 117 F. Supp.2d at 707 (parallel citations omitted).

The district court made the following finding:

The evidence presented in the depositions and literature of Lipscomb shows that, while Lipscomb may effectively

the meaning of the *Hunt* test, a different conclusion might be compelled.

"Individual projects can be properly evaluated if and when challenges arise with respect to particular recipients and some evidence is then presented to show that the institution does in fact possess these (disqualifying) characteristics." (*Tilton v. Richardson* (1971) *supra*, 403 U.S. 672, 682.))  We emphasize, however, that the fact an institution of higher education is affiliated with or governed by a religious organization is insufficient, without more, to establish that aid to that institution impermissibly advances religion. (*See Hunt v. McNair* (1973) *supra,* 413 U.S. 734, 743; *Tilton v. Richardson* (1971) *supra*, 403 U.S. 672, 686-687.)

*Priest*, 526 P.2d at 518, n. 8 (parallel citations omitted.)

Further, contrary to the suggestion in the majority opinion, it is of no moment that "[t]he Board has arranged tax-exempt financing, for example, for a number of colleges and universities with and without a religious affiliation, as well as for low-income housing projects, the Country Music Hall of Fame, the Easter Seal Society, retirement centers, the Jewish Community Center, the Young Mens Christian Association, Nashville Public Radio."  As recognized by the Supreme Court, there is a distinction between a "pervasively sectarian" institution and a "religiously affiliated" one.  *See Johnson,* 241 F.3d at 510 ("A pervasively sectarian institution is one whose religious functions cannot be separated from its non-religious functions; an institution is not pervasively sectarian merely because it is religiously affiliated.") (citing *Hunt*, 413 U.S. at 743); *Columbia Union I,* 159 F.3d at 158 (citing *Roemer,* 426 U.S. at 750.)  Further, it is of no legal significance that "no claim is made that the Board ever favored or disfavored one religion over another."  *See Zelman,* 122 S. Ct. at 2505 (Breyer, J. dissenting opinion) (noting "the development of constitutional doctrine that reads the Establishment Clause as avoiding religious strife, *not* by

*the present case under Walz v. Tax Comm'n, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), where this Court upheld a local property tax exemption which included religious institutions.*

413 U.S. at 745 n. 7 (emphasis added). Equally, in *Johnson,* this Court declined to resolve whether a very similar type of tax-exempt revenue bond issue amounts to a direct benefit because it held that the religious academy was not a pervasively sectarian educational institution. 241 F.3d at 511, n. 3. However, unlike those cases in which the institutions were found not to be pervasively sectarian, the issue must be directly confronted here because Lipscomb is an institution in which religion is so pervasive that a substantial portion of its functions is subsumed in the religious mission so as to suggest that the state aid to Lipscomb has the primary effect of advancing religion.

In deciding this question, it is advisable to make some preliminary observations. First, although the majority opinion correctly notes that this precise issue has not been addressed by other circuits or by the Supreme Court, it inaccurately states that all the state courts that have addressed the issue "have found that the issuance of industrial revenue bonds is not tantamount to the giving of direct aid to religious schools." Opn. at n. 2. However, with the exception of the Virginia Supreme Court's decision in *Lynn*, 538 S.E.2d at 682, none of the cases cited by the majority has addressed the precise question at hand, namely, whether tax-exempt bond financing to a pervasively sectarian educational institution constituted a form of direct state aid, having the primary effect of advancing religion, in violation of the Establishment Clause. Indeed, as noted by the California Supreme Court in *Calif. Educ. Facilities Auth. v. Priest*, 526 P.2d 513, 518, n. 8 (Cal. 1974), one of the cases cited by the majority:

Of course, if the Authority were to exercise its powers in aid of an institution which is pervasively sectarian within

teach a wide variety of secular courses, the central mission of the school is to inculcate and promote Churches of Christ doctrine as the true word of God. Students are taught entirely by Churches of Christ members; are informed of the importance of the Bible in all areas of their lives; are expected to attend Bible courses and chapel on a daily basis and surrounded by an environment thoroughly saturated by Churches of Christ doctrine. The school does not follow the Statement of Principles on Academic Freedom of the AAUP, and the section of the faculty handbook dealing with research states that the primary aim of every instructor should be to give superior academic instruction, emphasizing daily instruction in the Bible. Lipscomb's Board of Directors, which controls all major decisions of the school, contains only members of the Church of Christ. Christian education is one of the three principal duties of the president of the school. In this environment, the chance that religion "would seep into the teaching of secular subjects," as discussed in *Roemer*, 426 U.S. at 751, 96 S. Ct. at 2347, seems inevitable.

*Id.* at 715 (internal citations omitted). Accordingly, the district court found that Lipscomb University is a pervasively sectarian institution.

The vitality of the pervasively sectarian test is questionable in light of subsequent, more recent decisions from the Supreme Court. In *Mitchell v. Helms*, 530 U.S. 793 (2000), six of nine Justices rejected an Establishment Clause challenge to loans of educational materials directly to parochial schools. Justice Souter pointed out in his dissenting opinion that "[N]o one, indeed, disputes . . . that the Roman Catholic schools which made up the majority of the private schools participating, were pervasively sectarian . . . ." In his plurality opinion, Justice Thomas responded by stating that:

[T]he dissent is correct that there was a period of time when this factor mattered, particularly if the pervasively

sectarian school was a primary or secondary school. But that period is one that the Court should regret, and it is thankfully long past."

*Id.* at 826. Justice Thomas went on to note that the pervasively sectarian analysis, "born of bigotry, should be buried now." *Id.* at 829.

Yet, *Mitchell* is a plurality opinion. Thus, the district court, and this Court, are still bound by pre-*Mitchell* law with regard to the pervasively sectarian doctrine. As the district court correctly noted:

It is well settled that in a plurality opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Coe v. Bell*, 161 F.3d 320, 354 (6th Cir. 1998) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)); *see also, Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 764, fn. 9 (1988); *Reese v. City of Columbus*, 71 F.3d 619, 625 (6th Cir. 1995). In *Mitchell*, there is no single part of any opinion that commands the support of a majority of the Court. As a result, the only binding precedent of *Mitchell* is the holding. *See* Igor Kirman, Note, *Standing Apart to be A Part: The Precendential Value of Supreme Court Concurring Opinions*, 95 Colum. L. Rev. 2083, 2084-85 (1995); Ken Kimura, *A Legitimacy Model for the Interpretation of Plurality Decisions*, 77 Cornell L. Rev. 593, 1596-98 (1992).

*Steele*, 117 F. Supp.2d at 706 (parallel citations omitted).

Further, the Supreme Court has specifically stated that the lower courts are to treat its prior cases as controlling until the Supreme Court itself specifically overrules them. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). In reaffirming its prior mandate the Court noted in *Agostini* that "if a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court

**The issuance of tax-exempt revenue bonds in this case constitutes direct aid within the meaning of the Establishment Clause**

Given that Lipscomb is a pervasively sectarian educational institution, it thus must be determined whether the issuance of the tax-exempt revenue bonds is a direct or indirect benefit for Establishment Clause purposes. In this regard, it should be noted that because *Hunt* found that the Baptist College at Charleston was not a sectarian educational institution, it did not need to decide the issue whether the issuance of the revenue bonds constituted direct state aid in that case. In a footnote, though, the Court in *Hunt* remarked:

The 'state aid' involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available. The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a 'governmental service.' *Clayton v. Kervick*, 56 N.J. 523, 530-531, 267 A.2d 503, 506-507 (1970). The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a "mere conduit." 258 S.Ct., at 107, 187 S.E.2d, at 650. *Because we conclude that the primary effect of the assistance afforded here is neither to advance nor to inhibit religion under Lemon and Tilton, we need not decide whether, as appellees argue, Brief for Appellees 14, the importance of the tax exemption in the South Carolina scheme brings*

encourages faculty to "pursue truth . . . by research, discussion, and other forms of inquiry." Nonetheless, Regent prohibits faculty from using "their position or classroom as a platform to demand adherence by students to a personal theological viewpoint, political preference or social agenda." The SACS in a review of Regent's accreditation application in 1998 found that "[f]aculty and students are free to examine all pertinent data, question assumptions, be guided by the evidence of scholarly research, and teach and study the substance of a given discipline." With respect to its curriculum, each faculty member at Regent is required to include in the syllabus for each class a "description of how the Christian faith and the Bible will be incorporated into the course."

*Id*. at 617-18.

Like Regent, the "supreme purpose" of Lipscomb is to promote Christian ideals. Both Lipscomb and Regent also require applicants to submit a recommendation from a member of the clergy, without specifying the denomination. However, unlike Regent, nearly three-quarters of the students at Lipscomb are identified with a particular creed, the Churches of Christ. Further, in contrast to Regent, which encourages, but does not require, its students to attend chapel services or to participate in certain religious activities, daily Bible class and chapel attendance are mandatory at Lipscomb. In addition, while both schools require its faculty to adhere to religious principles and to incorporate the Bible into class instruction, Regent provides much greater latitude in terms of academic freedom than Lipscomb. Thus, even among pervasively sectarian religious institutions, Lipscomb clearly stands out as unrelentingly sectarian in its policies and practices.

of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id. citing Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). It is for the Supreme Court, not this Court, to jettison the pervasively sectarian test, which it has not done.

Regardless of whether the pervasively sectarian test is still the law, we conclude that, given the nature of the aid in question, the issue of the bonds does not offend the Establishment Clause.

**B.  Nature of the Institution Receiving the Aid**

The precise type of aid at issue in this appeal is virtually identical to the bonding mechanisms involved in *Hunt v. McNair*, 413 U.S. 734 (1973). The Supreme Court described the program as follows:

> The "state aid" involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and no extending or committing of a State's credit. Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available. The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a "governmental service." The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a "mere conduit."

*Hunt*, 413 U.S. at 745 n7.

This passage would seem to indicate that a public body could serve as a conduit to allow a pervasively sectarian institution to receive the benefits of tax free bonds so long as public funds were not expended. Rather than reach such conclusion, however, the Supreme Court instead found that the schools at issue were not, in fact, pervasively sectarian and found it unnecessary to address the precise issue before this Court. Since *Hunt*, the Supreme Court has not addressed the issue.

More recently, in *Johnson v. Economic Development Corp.*, 241 F.3d 501 (6th Cir. 2001), this Court considered a case involving facts similar to *Hunt*, *supra*. In *Johnson*, a private Catholic school applied for and was granted an industrial revenue bond from the Michigan Economic Development Corporation, an agency of the State of Michigan. This Court held that the school, although a Roman Catholic institution, was not a pervasively sectarian institution. *Id.* at 515.

Because of this conclusion, the Court did not resolve the question of whether the granting of an industrial revenue bond to a pervasively sectarian institution is an unconstitutional form of aid. The *Johnson* Court did note, however, that:

[I]t is far from settled that the type of aid at issue in this case is direct aid within the meaning of the Establishment Clause jurisdiction.

*Id.* at 510.

Moreover, the Court also made the following observation:

Plaintiff claims that the tax-exemption under the EDC Act is the equivalent of a tax subsidy for purposes of the Establishment Clause. . . . The Supreme Court has expressly rejected the argument. "There is a constitutionally significant difference between subsidies and tax exemptions." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 590, & n.25 (citing

---

Vision--Our vision, through our graduates and other scholarly activities, is to provide Christian leadership in transforming society by affirming and teaching principles of truth, justice and love as described in the Holy Scriptures, embodied in the person of Jesus Christ, and enabled through the power of the Holy Spirit.

*Id.* In spite of its religious mission, Regent does not have any "specific religious requirement for student admissions, and "the lack of such a '[Christian] commitment' does not negatively impact an applicant's standing for admission." *Id.* at 686. However, the Virginia Supreme Court noted that "[a]ll applicants are required to submit a 'Clergy Recommendation,' both as a matter of policy and practice. Among the questions asked is whether the applicant has 'made a meaningful personal commitment to Jesus Christ.'" *Id.* The Virginia Supreme Court in *Lynn* further remarked:

Although encouraged to do so, students are not required to attend Regent's weekly corporate chapel services or participate in any particular religious activities. However, they must have "[p]ersonal goals consistent with the mission and goals of Regent University," and must submit a "[p]ersonal goals statement" addressing how their "personal and spiritual objectives" relate to Regent's "Christ-centered educational philosophy." The instructions explain that "for the Christian, [a goal] is a statement of faith in God's will for his or her life."

Faculty, unlike students, are required to sign a document indicating their adherence to the "Statement of Faith." They are "strongly encouraged but they're not required" to attend chapel. The faculty is required to integrate "faith and learning." Dr. Selig testified, and the SACS (Southern Association of Colleges and Schools) and the ABA (American Bar Association) agree, that the Statement of Faith has not interfered with academic freedom. Regent's detailed academic freedom policy

institution for Establishment Clause purposes. As noted by the Virginia Supreme Court in *Lynn*,

Regent's Articles of Incorporation, provide that:

[Regent] shall exist for the purpose of bringing glory to God and His Son Jesus Christ by providing an institution or institutions of learning in which those who are mature in the knowledge of God and His ways can assist and guide, in a spirit of free inquiry and scholarly excellence, those who would learn of Him, His ways, and His creation, while together they study ways to glorify God and better their world.

538 S.E.2d at 685. *Lynn* also noted that Regent has adopted a Statement of Faith that provides,

Regent University is a Christ-centered institution. The Board of Trustees, along with the faculty and staff of the university, are committed to an evangelical interpretation and application of the Christian faith. The campus community is closely identified with the present-day renewal movement, which emphasizes the gifts, fruit and ministries of the Holy Spirit. It is expected that all trustees, officers, administrators and faculty will subscribe to this statement in writing[.]

*Id.* Regent's Mission Statement provides:

Preamble--Regent University is a graduate institution that exists to bring glory to God the Father and His Son Jesus Christ through the work of the Holy Spirit.

Mission--Our mission is to provide an exemplary graduate education from biblical perspectives to aspiring servant leaders in pivotal professions and to be a leading center of Christian thought and action.

Walz, 397 U.S. [664,] 690 [(1970)]). The difference between subsidies and tax exemptions is that in giving tax exemptions "the government does not transfer part of its revenue . . . but simply abstains from demanding the [entity] support the state." *Walz*, 397 U.S. at 675. Therefore, the benefit provided by the tax-exempt status of the bonds does not amount to a cash subsidy.

*Id.* at 511-12 (parallel citations omitted).

Judge Nelson, in a concurring opinion, was even more direct and concluded that conduit financing in the form of an industrial revenue bond does not offend the Establishment Clause, even if the benefitting institution is pervasively sectarian. *Id.* at 518-19. He concluded that the type of aid in question was no different than the indirect aid provided by property tax exemptions available to religious institutions and expressly approved by the Supreme Court in *Walz, infra*. *Id.* at 519.

In the case at bar, the Board provides pass-through or conduit financing services to a wide variety of nonreligious and religious nonprofit organizations. The Board has arranged tax exempt financing, for example, for a number of colleges and universities with and without a religious affiliation, as well as for low-income housing projects, the Country Music Hall of Fame, the Easter Seal Society, retirement centers, the Jewish Community Center, the Young Mens Christian Association, and Nashville Public Radio. (Cochran Aff. at 3-4; Pressnell Aff. at 2 & Ex. B). Further, similar conduit financing has been provided to a number of privately owned development projects.[5] Significantly, no claim is made that the Board ever favored or disfavored one religion over another.

---

[5] The Court notes that Congress has acted to limit the number of bonds issued by state and local government. The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 214, 96 Stat. 324, 466-68 (codified at I.R.C. § 103(b)(6)).

## C. Nature of the Aid

Lipscomb University contends that the bonds represent indirect aid of the type the Supreme Cout upheld in *Walz v. Tax Commission*, 397 U.S. 664 (1970). The *Walz* Court held that a statute which provided a tax exemption for real estate owned by religious organizations did not represent an unconstitutional governmental attempt to establish, sponsor, or support religion. In language pertinent to this appeal, the Supreme Court noted:

> The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenues to churches but simply abstains from demanding that the church support the state.

*Id.* at 675. The Supreme Court concluded that "[t]here is no genuine nexus between tax exemption and establishment of religion." *Id.*

Subsequently, the Court made clear that an indirect financial benefit conferred by a religiously neutral tax does not give rise to an Establishment Clause violation. In *Mueller v. Allen*, 463 U.S. 388 (1983), the Court upheld a tax deduction for amounts paid as school tuition, text books, and transportation.[6]  The Court acknowledged that "religious

---

[6]The Court found significant that these deductions were among many deductions allowed under Minnesota law. For example, the Court found that:

> Deductions for charitable contributions, allowed by Minnesota law, Minn. Stat. § 290.21, subd. 3 (1982), include contributions to religious institutions, and exemptions from property tax for property used for charitable purposes under Minnesota law include property used for wholly religious purposes, § 272.02. In each case, it may be that religious institutions benefit very substantially from the allowance of such deductions. The Court's holding in *Walz v. Tax Comm'n*, 397 U.S. 664 (1970), indicates, however, that this does not require the conclusion that such

*Columbia Union Coll. v. Oliver*, 254 F.3d 496 (4th Cir. 2001) (*"Columbia Union II"*). In *Columbia Union II,* the Fourth Circuit stated:

> The district court respected fully the majority's order of remand in *Columbia Union I*. Working through the four factors in this case, the court found that although Columbia Union had a mandatory worship policy, it applied only to a minority of students. With regard to the second factor, the court held that the evidence submitted by the Commission was insufficient to show that the traditional liberal arts classes were "taught with the primary objective of religious indoctrination." The court pointed to "affirmative evidence indicating that secular education is the primary goal of" Columbia Union. The court examined the college's mission statement and the descriptions of secular curricula in the college's catalog, among other things, in making this finding. The court looked at the college's syllabi for secular courses and determined that the religious references were too isolated and scattered to justify a finding that religion permeates the secular courses. And although the court found that the Seventh-day Adventist Church exerted a dominance over college affairs and that the college gave an express preference in hiring and admissions to members of the Church, these factors by themselves were not enough to make the college a pervasively sectarian one.

*Id*. at 508-09. In contrast to Columbia Union College, Lipscomb has a mandatory worship policy and imparts instruction with the primary objective of religious indoctrination. Lipscomb also places religious restrictions on admission and expressly hires faculty and staff based upon membership in the Churches of Christ.

Indeed, Lipscomb is even more pervasively sectarian than Regent University ("Regent"), the only other institution that has been found by a court to be a pervasively sectarian

Moreover, there are no religious requirements for membership on the Academy's Board of Trustees. Non-Catholics have served, and currently serve, on the Board.

In addition, the Academy does not discriminate on the basis of race, color, creed, or national origin in its admissions process, nor does it give preference in admission to Roman Catholics. Furthermore, the Academy does not discriminate on the basis of race, color, or national origin in any of its educational policies, scholarship and loan programs, athletic or extracurricular activities, or other-school administered programs. As of the date of the issuance of the bonds at issue, 135 of the 366 (non-preschool) students at the Academy, or 37%, were not Catholic. And as of the date of the stipulation, 34% of the students were not Catholic. The facts indicate that faiths represented in the Academy student body include non-Catholic Christian, Jewish, Islamic, Shinto and others. Finally, the Academy does not discriminate on the basis of race, color, creed or national origin in the hiring of its employees. The Academy has a teaching faculty of 60, of whom five are members of religious orders. There is no religious-affiliation requirement or preference for the Academy's teachers, and the school does not inquire as to the religious affiliation of prospective faculty members.

*Johnson*, 241 F.3d at 516-17. Most striking, Lipscomb, unlike the academy in *Johnson*, interjects religion into virtually all aspects of its institutional life. Further, unlike the school in *Johnson,* Lipscomb reserves the right under Title VII of the Civil Rights Act of 1964 to discriminate in the hiring of faculty and staff on the basis of religion.

Lipscomb is also distinguishable from Columbia Union College, the educational institution affiliated with the Seventh Day Adventist Church that the Fourth Circuit did not regard as a pervasively sectarian educational institution. *See*

institutions benefit very substantially from the allowance" of this kind of tax deduction. *Id.* at 396 n.5. The Court found that both parents and parochial schools received a benefit, and the assistance "ultimately has an economic effect comparable to that of aid given directly to the schools attended by the children." *Id.* at 399. Irrespective of this benefit, the Court acknowledged its decisions "consistently have recognized that traditionally '[legislatures] have especially broad latitude in creating classifications and distinctions in tax statutes,' *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 547 (1983), in part because the 'familiarity with local conditions' enjoyed by legislators especially enables them to 'achieve an equitable distribution of the tax burden.'" *Madden v. Kentucky*, 309 U.S. 83, 88 (1940). *Id.* at 396. Thus, a religious school's receipt of indirect benefits through a tax deduction "does not require the conclusion that such provisions of a state's tax law violate the Establishment Clause." *Id.* at 396. As long as the tax benefit is neutrally available,[7] the Establishment Clause is not violated.

The only evidence of record is that similar bonds have been issued to both religious and non-religious institutions in a neutral manner. The financing in question has been made available to colleges and universities in Metro, as well as

---

provisions of a State's tax law violate the Establishment Clause.

*Mueller*, 463 U.S. at 396 and n.5.

[7] The *Mueller* court found that "[M]ost importantly, the deduction is available for educational expenses incurred by all parents, including those whose children attend public schools and those whose children attend nonsectarian private schools or sectarian private schools." The Court analogized to *Widmar v. Vincent*, 454 U.S. 263, 274 (1981), where it "concluded that the State's provision of a forum neutrally 'available to a broad class of nonreligious as well as religious speakers' does not 'confer any imprimatur of state approval,'" The Court concluded that "here: '[the] provision of benefits to so broad a spectrum of groups is an important index of secular effect.'" *Meuller*, 463 U.S. at n.7. We address the neutrality issue *infra*.

throughout Tennessee and the United States, and has been provided to a number of colleges and universities with different kinds of religious affiliations, and those without any religious affiliation.

In *Mueller*, the Supreme Court distinguished its holding in *Nyquist v. Committee for Public Education and Religious Liberty*, 413 U.S. 756 (1973). In *Nyquist*, the state legislation at issue included a wide range of government financial assistance in aid of private, predominately parochial education. State money was directed for maintenance and repair of private schools. In addition, the legislation provided for both direct tuition grants and tax credits payable to parents whose children attended private schools. In *Mueller*, the Court noted that the outright grants in *Nyquist* were fundamentally different from tax deductions given to all parents of public and private school students for education related expenses. 463 U.S. at 396 n.6. Further, unlike the deductions approved in *Mueller*, the deductions at issue in *Nyquist* were not based on actual expenses incurred. Instead, the deductible amounts were estimated and designed to equal the dollar amount of the direct aid in the form of tuition grants available only to low income families. *Id.* The Court concluded that these grants did not take the form of ordinary tax benefits and constituted direct aid to religious schools.

In *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 688 (1989), the Court held provisions of the Internal Revenue Code permitting federal taxpayers to deduct gifts or contributions made to a variety of charitable organizations, including purely religious groups did not violate the Establishment Clause. In *Hernandez,* members of the Church of Scientology contended that the First Amendment prevented the IRS from deeming obligatory payments for attendance of "auditing sessions" as something other than a charitable contribution. *Id.* at 680. The IRS contended that a mandatory payment to the church for auditing and training was not a gift, but rather a *quid pro quo* payment for services received and therefore not deductible.

educational institutions that the Supreme Court has found not to be pervasively sectarian.

It should also be noted that Lipscomb is markedly different from the religious academy in *Johnson* that this Court found not to be pervasively sectarian. In *Johnson*, this Court described the religious academy in the following terms:

As to the nature of the institution, as with any religiously affiliated school, the Academy pledges its allegiance to its faith. Nevertheless, the facts establish that the Academy is not a pervasively sectarian institution. The Academy's Restated Articles of Incorporation provide that the school's purpose is to "conduct an independent Catholic school from pre-school through and including the 12th grade, wherein the arts and sciences, and other forms of primary and secondary learning are taught, and diplomas and honors therein conferred: while maintaining a philosophy consonant with that of the network of the Sacred Heart schools of which it is a member." (J.A. at 66.) The Academy's curriculum and requirements provides that

[e]very student at [the Academy] receives intensive training in the basic academic skills of English, Mathematics, History, Foreign Language and Science. Art, Music, Drama, Forensics, Theology and Computer Science are essential parts of this program. [The Academy] offers each student a full Physical Education Program designed to develop a sense of sportsmanship, a respect for physical fitness and an awareness of the enjoyment derived from athletic endeavors.

(J.A. at 154.) A review of the course descriptions and the subjects covered for each of the courses offered at the Academy, with the exception of the Religion Department, demonstrates that the Academy does not interject religion into every aspect of its curriculum.

institution based upon the fact that it did not impose religious qualifications on its faculty and staff and given that the percentage of the student body roughly reflected the same percentage of Baptists in the area. Unlike the college in *Hunt,* which did not hire faculty on the basis of religion, apart from those teaching in the theology departments, Lipscomb requires that its faculty be members in good standing of the Churches of Christ. Further, the fact that the student body at Lipscomb is largely affiliated with the Churches of Christ reflects Lipscomb's placement of religious restrictions on student admissions.

Lipscomb is also clearly distinguishable from the Roman Catholic colleges in *Roemer*, which were "characterized by a high degree of institutional autonomy" from "their formal affiliation with the Roman Catholic Church." *Roemer*, 426 U.S. at 755. By contrast, Lipscomb's "supreme purpose" is "to teach the Bible as the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who will attend in a pure Bible Christianity." Further, unlike the colleges in *Roemer*, Lipscomb does not subscribe to the AAUP's Statement of Principles on Academic Freedom. Moreover, unlike the colleges in *Roemer*, where attendance at religious exercises was not required and where spiritual development was encouraged as a "secondary objective," Lipscomb requires attendance at religious service, placing those who fail to attend on "chapel probation," and clearly promotes spiritual development as the primary objective of the institution. While the colleges in *Roemer* gave mandatory religion and theology courses taught "primarily by Roman Catholic clerics," those courses only supplemented "a curriculum covering 'the spectrum of a liberal arts program.'" *Roemer,* 426 U.S. at 756. In contrast, the Bible classes at Lipscomb are central to the mission of the school, and the failure to pass a Bible course results in a student being placed on "Bible probation," which subjects the student to dismissal from the school if he or she does not pass every Bible course taken while on Bible probation. Lipscomb thus clearly stands separate and apart from the higher

The Church of Scientology contended that the disallowance of such payments as charitable deductions violated the Establishment Clause, *inter alia*, by creating excessive entanglement between church and state. The Supreme Court found no excessive entanglement and, in language pertinent to the issue before this Court, stated that "routine regulatory interaction which involves no inquiries into religious doctrine . . . no delegation of state power to a religious body . . . and no 'detailed monitoring and close administrative contact' between secular and religious bodies . . . does not of itself violate the nonentanglement command." *Id.* at 696-97 (internal citations omitted).

Most recently, in *Zelman v. Simmons-Harris*, 536 U.S. at ___ (2002), the Supreme Court again distinguished its holding in *Nyquist*. The *Zelman* Court found that the school voucher program in Ohio did not violate the Establishment Clause. The Court found that the program was controlled by its holdings in *Mueller*, *Witters*, and *Zobrest*. As to *Nyquist* the Court held:

> To the extent the scope of *Nyquist* has remained an open question in light of these later decisions, we now hold that *Nyquist* does not govern neutral educational assistance programs that, like the program here, offer aid directly to a broad class of individual recipients defined without regard to religion.

*Zobrest*, 536 U.S. at ___.

In a concurring opinion in *Zelman*, Justice O'Connor explained that a government program is not constitutionally infirm solely because a sustantial benefit is conferred on a religious organization. 536 U.S. at ___ (O'Connor, J. concurrence). She explained:

> Although $8.2 million is no small sum, it pales in comparison to the amount of funds that federal, state, and local governments already provide religious institutions.

Religious organizations may qualify for exemptions from the federal corporate income tax, see 26 U.S.C. § 501(c)(3); the corporate income tax in many States, *see, e.g.,* Cal. Rev. & Tax.Code Ann. § 23701d (West 1992); and property taxes in all 50 States, see K. Turner, Property Tax Exemptions for Nonprofits, 12-Oct. Probate and Property 25 (1998); and clergy qualify for a federal tax break on income used for housing expenses, 26 U.S.C. § 1402(a)(8). In addition, the Federal Government provides individuals, corporations, trusts, and estates a tax deduction for charitable contributions to qualified religious groups. See §§ 170, 642(c). Finally, the Federal Government and certain state governments provide tax credits for educational expenses, many of which are spent on education at religious schools. *See, e.g.,* § 25A (Hope tax credit); Minn.Stat. § 290.0674 (Supp.2001).

Most of these tax policies are well established, *see, e.g., Mueller v. Allen*, 463 U.S. 388 (1983) (upholding Minnesota tax deduction for educational expenses); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664 (1970) (upholding an exemption for religious organizations from New York property tax), yet confer a significant relative benefit on religious institutions. The state property tax exemptions for religious institutions alone amount to very large sums annually.

*Id.* (parallel citations omitted).

Similar to the benefits at issue in *Walz*, *Mueller*, *Hernandez*, and now, *Zelman*, the bonds at issue in this case are analogous to an indirect financial benefit conferred by a religiously neutral tax or deduction.

### D. Method by Which the Aid is Issued

The method by which the tax exempt bonds are to be issued to Lipscomb University is significant. Any institution seeking a tax exempt bond must arrange the financing by locating

these four institutions requires its students to attend religious services. Although all four schools require their students to take theology courses, the parties stipulated that these courses are taught according to the academic requirements of the subject matter and the teacher's concept of professional standards. The parties also stipulated that the courses covered a range of human religious experiences and are not limited to courses about the Roman Catholic religion. The schools introduced evidence that they made no attempt to indoctrinate students or to proselytize. Indeed, some of the required theology courses at Albertus Magnus and Sacred Heart are taught by rabbis. Finally, as we have noted, these four schools subscribe to a well-established set of principles of academic freedom, and nothing in this record shows that these principles are not in fact followed. In short, the evidence shows institutions with admittedly religious functions but whose predominant higher education mission is to provide their students with a secular education.

*Id*. at 686-687. Unlike *Tilton*, where the theology courses at the colleges affiliated with the Roman Catholic Church were "taught according to the academic requirements and the teacher's concept of professional standards," without attempting "to indoctrinate students or to proselytize," the religion classes at Lipscomb are Bible classes, not theology classes. At Lipscomb, Bible classes are taught as "the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who will attend in a pure Bible Christianity, excluding from the faith all opinions and philosophies of men, and from the work and worship of the church of God all human inventions and devices," except those that "will aid in the understanding and teaching of the Scriptures."

Lipscomb also clearly differs from the Baptist college in *Hunt*. As already noted, the Baptist College at Charleston was not found to be a pervasively sectarian educational

testimony that Lipscomb instructs the faculty in the Biology and Physics Departments to "teach creationism." By Lipscomb's own admission, the religious tenets of the Churches of Christ are designed to permeate every facet of the University, including classroom instruction in subjects that are considered non-religious or nonsectarian.

Here, the record shows that Lipscomb satisfies all the elements of a sectarian educational institution profile, conclusively demonstrating that religion pervades it to such an extent that "its functions are subsumed in the religious mission." *Hunt*, 413 U.S. at 743. Accordingly, there is no genuine issue of material fact about whether Lipscomb is a pervasively sectarian educational institution.

**Lipscomb is clearly distinguishable from educational institutions found not to be pervasively sectarian**

As an educational institution, Lipscomb is clearly distinguishable from those higher educational institutions that the Supreme Court has found not to be pervasively sectarian. For example, in *Tilton v. Richardson*, 403 U.S. 672 (1971), the Supreme Court found that a direct federal grant awarded pursuant to the Higher Education Facilities Act of 1963 to four colleges and universities affiliated with the Roman Catholic Church for the construction of academic facilities devoted to secular purposes did not violate the Establishment Clause, except for the section of the Act that limited federal interest in the facilities to a period of twenty years because it allowed the unconstitutional contribution of valuable property to a religious institution, and could be "used to promote religious interests." 403 U.S. at 683. The colleges in *Tilton* were described in the following terms:

> All four schools are governed by Catholic religious organizations, and the faculties and student bodies at each are predominantly Catholic. Nevertheless, the evidence shows that non-Catholics were admitted as students and given faculty appointments. Not one of

exclusively private lenders of the funds. The purchaser of a bond has recourse for repayment against Lipscomb University only; the holder of a bond has no recourse against the Board or Metro in the event of non-payment. No government funds are involved in the entire transaction. The interest paid to the bond holders by Lipscomb University is not subject to federal, state or local income taxes. Since the bonds are tax exempt, Lipscomb University reaps the benefit of a lower interest rate than that paid to a lender paying income taxes on the interest received. Only by the potential loss of tax revenue does the conduit financing involve any impact on public funds.

Initially, we note that a governmental body must issue the bonds. While at first blush such fact would indicate governmental endorsement of religion, the reason for the issuance of the bonds by a governmental agency stems from the simple fact that the Internal Revenue Code excludes from income taxation only interest paid on industrial revenue bonds issued and approved by a state or local governmental unit. 28 U.S.C. § 147(f)(2)(A). Such qualifying bonds need not finance a governmental function (such as water or sewer lines), but may be issued to promote a variety of purposes, including economic development and higher education. Further, Tennessee law requires such bonds serve the "furtherance of the educational purposes of such institution, including but not limited to classroom, laboratory, housing, administrative, physical education, and medical research and treatment facilities." Tenn. Code Ann. §§ 7-53-101(11)(A)(vii).

The federal government has continuously provided an exemption for interest on bonds issued "by or on behalf of" states and localities since the inception of a federal income tax in 1913. Tariff Act of 1913, Pub. L. No. 63-16, ch. 16, 38 Stat. 114. Although states and localities first took advantage of this exception by issuing general obligation bonds, they later issued revenue bonds to help finance private business activities for the ostensible purpose of promoting economic growth. Stuart C. Johnson, *Multi-Family Housing Bonds:*

*Can the Tax Code Provide an Efficient and Effective Low-Income Housing Program*, 5 Va. Tax. Rev. 497, 498-99 (1986) (citations omitted). Congress provided for an exemption from income taxation for industrial revenue bonds issued in connection with a project intended to benefit a local economy. The Internal Revenue Service explicitly legitimized this practice in 1954. Rev. Rul. 54-106, 1954-1 C.B. 28, 28-29.[8] Such bonds have been typically issued by a governmental authority, even though such authority does not actually borrow the funds nor is such authority liable for repayment. "A revenue bond is repaid solely from the revenues generated by the facilities constructed with bond proceeds. In the issuance of this type of bond, the political subdivision acts solely as a conduit for issuing the bonds. It has no obligation to use its tax revenues to finance any shortfall." Zimmerman, *Limiting the Growth of Tax-Exempt Industrial Development Bonds: An Economic Evaluations* (1984) (Cong. Research Serv. Rep. No. 84-37E).

In addition, by requiring local governmental authorities to issue tax-exempt industrial revenue bonds, Congress delegated to such governmental units an element of control over local economic development. The revenue bonds serve as a means of financing local preferences. *See* Clayton P. Gillette, *Fiscal Federalism and the Use of Municipal Bond Proceeds*, 58 N.Y.U.L. Rev. 1030 (1983) (discussing Section 103 of the Internal Revenue Code, which provides a federal tax exemption for interest earned on state and municipal

---

[8]The Service classified as tax exempt those bonds issued by a municipality to finance construction of privately used industrial plants, "notwithstanding the purpose for which they were issued or the fact that the promise to pay is limited to the revenue to be derived from leasing the property to be acquired. . . . It is not necessary . . . that the obligation be a general one, pledging the general credit of the municipality or the use of its taxing power."

Gospels, The Church, Old Testament, and Defense of the Faith. According to Lipscomb, the Bible is the inspired word of God, and students are encouraged to apply Biblical principles in conducting the affairs of their personal and professional lives. Students are also required to pass Bible courses, and the failure to do so results in being placed on "Bible probation," which could lead to expulsion. From 1988 to 1992, approximately 100 students were placed on Bible probation. In addition, students are required to attend chapel every school day, and the failure to do so may lead to being placed on "chapel probation."

Fourth, attendance at chapel and the study of the Bible at Lipscomb are an "integral part" of the religious mission of the Churches of Christ. This is made clear repeatedly throughout Lipscomb's Faculty and Student Handbooks, as well as its university catalogues.

Fifth, religious indoctrination is a "substantial purpose" at Lipscomb. As set forth in Lipscomb's corporate charter and bylaws of the Board of Directors, "[t]he corporation was organized for the purpose of teaching the word of God and the various branches of the useful knowledge, commonly taught in institutions of learning for the following general purpose: . . . the support of public worship, the building of churches and chapels and the maintenance of missionary undertakings." Moreover, as the district court noted, "[t]he land on which the construction projects funded by the bond proceeds were undertaken is subject to restrictive covenants that require that the property be used exclusively to further the religious mission of the institution so long as the property is owned by Lipscomb." *Steele v. Indus. Dev. Bd. of the Metro. Gov. of Nashville and Davidson County*, 117 F.Supp.2d 693, 710 (M.D. Tenn. 2000).

Sixth, Lipscomb imposes religious restrictions on how and what the faculty teach. As Lipscomb acknowledges, it does not subscribe to the AAUP's Statement of Principles on Academic Freedom. Specifically, there was unrebutted

## Lipscomb fits the profile of a pervasively sectarian educational institution

Viewing the undisputed facts, the district court properly concluded that Lipscomb is, as a matter of law, a pervasively sectarian educational institution. First, the record indicates that Lipscomb places religious restrictions on admission, and that more than 70% of the student body belongs to the Churches of Christ. Lipscomb also places religious restrictions on faculty and staff appointments, requiring that all personnel, with limited exceptions, be members in good standing of the Churches of Christ. Specifically, all members of Lipscomb's faculty and staff are expected to attend daily chapel and adhere to church doctrines. Further, faculty members are contractually bound to promote the beliefs of the Churches of Christ, both in and out of the classroom, and if any member leaves the church, it is an immediate ground for termination of employment. As noted by the district court, Lipscomb also reserves the right under Title VII of the Civil Rights Act of 1964 (as amended) to discriminate, "where it is necessitated by the specific religious tenets held by the institution."

Second, Lipscomb enforces obedience to its religious dogma, directing that the Bible be taught "every school day to every student enrolled . . . by teachers who are sound in the faith and faithful in their lives to its sacred truths." According to Lipscomb, its "supreme purpose" is "to teach the Bible as the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who will attend in a pure Bible Christianity."

Third, Lipscomb requires its students to participate in daily Bible study and attendance at chapel. According to Lipscomb, "[t]he university has no authority to suspend [the daily Bible] requirement for any student." As the district court found, all students must take at least one Bible class every day of each semester and are required to take at least one course from each of the following four categories: The

bonds).[9] For example, a local government might conclude that the issuance of an industrial revenue bond to a new business could give a competitive disadvantage to an existing business which had not received such conduit financing and result in economic displacement, rather than development.

It is clear from the record that industrial revenue bonds are issued to a wide variety of businesses, schools, universities, charities and other organizations. It is without question that a religious organization may receive "general government benefits" consistent with the Establishment Clause. *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 8 (1993). As the Supreme Court noted in *Widmer v. Vincent,* 454 U.S. 263, 274, 275 (1981), "If the Establishment Clause barred the extension of general benefits to religious groups 'a church could not be protected by the police and fire departments or have its public sidewalk kept in repair'." *citing Roemer v. Bd. of Pub. Works.*, 426 U.S. 736, 747 (1976). We conclude that the issuance of tax exempt bonds on a neutral basis is the conference of a generally available governmental benefit.

---

[9]According to the Senate Committee on Finance, S. Rep. No. 494, 97th Cong., 2d Sess. 168 (1982), the public notice and approval requirements were enacted to help eliminate inappropriate uses of tax-exempt financing and to help restore the benefit of tax-exempt financing for traditional governmental purposes. While acknowledging that state and local governments are best suited to determine the appropriate uses of industrial developments bonds, the committee concluded that industrial development bonds serve a legitimate purposes only if (a) the affected public has an opportunity to comment on the use of tax-exempt financing for particular facilities and (b) after that input, the elected representatives of the governmental unit determine that there will be substantial public benefit from issuing the bonds. H.R. Conf. Rep. No. 760, 97th Cong., 2d Sess. 518 (1982), 1982-2 C.B. 623-24. Based on this legislative history, Metro has clearly fulfilled its obligation under 147 (f) to approve a bond issue that meets the public criteria.

## E.  Primary Purpose and Effect of the Program

In her concurrence in *Zelman*, Justice O'Connor reaffirmed that the modified *Lemon Test* is still a central tool in analysis of Establishment Clause cases noting:

As originally formulated, a statute passed this test only if it had "a secular legislative purpose," if its "principal or primary effect" was one that "neither advance[d] nor inhibit[ed] religion," and if it did "not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971) (internal quotation marks omitted).  In *Agostini v. Felton*, 521 U.S. 203, 218, 232-233 (1997), we folded the entanglement inquiry into the primary effect inquiry. This made sense because both inquiries rely on the same evidence, *see ibid.*, and the degree of entanglement has implications for whether a statute advances or inhibits religion, *see Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'CONNOR, J., concurring). The test today is basically the same as that set forth in *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 222 (1963) (*citing Everson v. Board of Ed. of Ewing*, 330 U.S. 1 (1947); *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)), over 40 years ago.

*Zelman*, 536 U.S. ___ (2002) (O'Connor, J. concurring opinion) (parallel citations omitted).

As to the primary purpose, industrial revenue bonds advance a clear governmental, secular interest in promoting economic and educational development.  Such conduit financing also promotes economic development though the underwriting of job-producing construction projects at colleges and universities.  In turn, a more educated populace is better positioned to generate new development and economic opportunity.  In a case involving industrial revenue bonds for a private religious high school, this Court held in *Johnson v. Economic Development Corp.*, 241 F.3d at 512:

Circuit identified four "general areas of inquiry" in determining whether a school is pervasively sectarian: "(1) does the college mandate religious worship; (2) to what extent do religious influences dominate the academic curriculum, (3) how much do religious preferences shape the college's faculty hiring and student admission processes, and (4) to what degree does the college enjoy 'institutional autonomy' apart from the church with which it is affiliated." *Id*. at 163.  Although the Fourth Circuit asserted that a college is not pervasively sectarian unless it possesses a "great many" of the characteristics identified in the four-factor test, 159 F.3d at 163, there is nothing clearly stated in prior Supreme Court precedent to the effect that a pervasively sectarian instruction must possess "a great many" of the relevant characteristics; rather, the focus of the inquiry is whether religion so permeates the secular education functions provided by a religious-affiliated educational institution that its religious and secular educational functions are in fact inseparable.  Further, I take issue with the statement by the Fourth Circuit in *Columbia Union I* that "because the Supreme Court has never held any institution of higher education to be 'pervasively sectarian,' we lack even a clear 'general picture' of a 'pervasively sectarian' college or university." 159 F.3d at 163.  In my view, the general profile of a pervasively sectarian institution is not as difficult to discern from Supreme Court jurisprudence as the Fourth Circuit purports it to be.  Although the Fourth Circuit correctly recognized that "[n]either the Supreme Court, nor any circuit court to our knowledge, has ever found a college to be pervasively sectarian," *id*. at 169, it is clear that the Supreme Court certainly left open this possibility. *See Hunt*, 413 U.S. at 743 (citing *Tilton v. Richardson*, 403 U.S. 672, 682 (1971)); *see also Va. Coll. Bldg. Auth. v. Lynn*, 260 Va. 608, 538 S.E.2d 682 (Va. 2000) (applying the elements of the *Roemer* test to find that Regent University, created under the auspices of the Christian Broadcasting Network, Inc., is a pervasively sectarian institution).

sectarian," the plurality opinion in *Roemer* noted that it was necessary to "paint a general picture of the institution, composed of many elements." *Id*. at 758. Summarizing the elements of a sectarian profile set forth in the Court's majority opinion in *Comm. for Public Educ. and Religious Liberty v. Nyquist,* 413 U.S. 756, 767-68 (1973), the plurality in *Roemer* stated:

> The elements of the "profile" were that the schools placed religious restrictions on admission and also faculty appointments; that they enforced obedience to religious dogma; that they required attendance at religious services and the study of particular religious doctrine; and that they were an 'integral part' of the religious mission of the sponsoring church; that they had religious indoctrination as a 'substantial purpose'; and that they imposed religious restrictions on how and what the faculty could teach.

*Roemer*, 426 U.S. at 753 n. 18 (citing *Nyquist*, 413 U.S. at 767-68).

In light of the views expressed in the majority opinions in *Hunt* and *Nyquist,* the proper starting point for evaluating the Establishment Clause challenge in this case is to adopt the profile for a pervasively sectarian educational institution stated by the plurality in *Roemer,* as this most closely adheres to Supreme Court precedent expressed in majority opinions on this topic. *See Agostini,* 521 U.S. at 237 (noting that "the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").

It should be noted that this approach accords with that taken by the Fourth Circuit in *Columbia Union Coll. v. Clarke,* 159 F.3d 151 (4th Cir. 1998) *("Columbia Union I"),* which adopted a four-factor test that is essentially a restatement of the Supreme Court's profile of a pervasively sectarian educational institution. In *Columbia Union I,* the Fourth

A state's decision to assist businesses in their operation in order to create and maintain jobs – regardless of the type of businesses – 'evidences a purpose that is both secular and understandable', *Mueller*, 463 U.S. at 395… Michigan could conclude that there is a strong public interest in promoting, assisting, and retaining commercial enterprises, both sectarian and non-sectarian.

As to the program's primary effect, tax free revenue bonds have neither the effect of advancing or inhibiting religion, or as Justice O'Connor has "put it, of 'endors[ing] or disapprov[ing] . . . religion.'" *Zelman*, 536 U.S. at ___ (O'Connor, J. concurrence) *citing Lynch v. Donnelly*, 465 U.S. at 691-92 (concurring opinion). Metro's program, "as in *Mueller*, '[] is made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefitted.'" *Zelman*, 536 U.S. at ___ *citing Mueller*, 474 U.S. at 487.

The effect of Metro's program is economic and educational development. Many states and local governments have used industrial revenue bonds to entice new, or expanded manufacturing, commercial, and educational projects. These projects, privately owned, are not financed with direct government funding, but are given preferential tax treatment through conduit financing. Lipscomb University seeks the same type of financing for the expansion of its facilities as could be sought by Walmart, Sears, or educational institutions. The Loan Agreement between the Board and Lipscomb University specifically prohibits it from using any bond-financed facilities for religious purposes. The projects Lipscomb University seeks to finance would provide no less economic development than a new store or a new manufacturing facility.

Further, as in the school funding program the Supreme Court upheld in *Zelman*, Metro's industrial revenue bond program does not present the perception of endorsement to the reasonable observer. "'[T]he reasonable observer in the

endorsement inquiry must be deemed aware' of the 'history and context' underlying a challenged program." *Zelman*, 536 U.S. at ___ *citing Good News Club v. Milford Central School*, 533 U.S. 98, 119 (2001). As the *Zelman* Court stated:

> Any objective observer familiar with the full history and context of the Ohio program would reasonably view it as one aspect of a broader undertaking to assist poor children in failed schools, not as an endorsement of religious schooling in general.

*Zelman*, 536 U.S. at ___.

Similarly, in the instant case, the objective observer of Metro's industrial revenue bond program, knowing the history and context of this program, would reasonably view it as one aspect of a broader undertaking to finance economic development, not as an endorsement of religious schooling in general. Metro no more endorsed Lipscomb University than it did Wal-Mart in issuing industrial revenue bonds.

## IV. CONCLUSION

Because the proposed issuance of industrial revenue bonds to Lipscomb University is part of a neutral program to benefit education, including that provided by sectarian institutions, and confers at best only an indirect benefit to the school, we hold that the issuance of the bonds does not violate the First Amendment.

In sum, the nature of the institution is not the relevant inquiry in the special type of aid at issue in this appeal. The nature of the aid conferred by the tax free revenue bonds is not direct aid. Instead, it is analogous to an indirect financial benefit conferred by a religiously neutral tax or charitable deduction and is indistinguishable from that expressly approved in *Walz, supra.* The funding vehicle is available on a neutral basis. No government funds will be expended. Nor does any holder of a bond have recourse against the Board or Metro in the event of non-payment. The benefit to be

> Aid normally may be thought to have a primary effect of advancing religion when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are [sic] subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting.

*Id*. at 743. The Court in *Hunt* concluded that the aid did not go to a pervasively sectarian institution, nor to fund specifically religious activities, and thus would not "place the Authority in the position of providing aid to the religious as opposed to the secular activities." *Id*. at 744. Although *Hunt* did not outline a test for identifying a pervasively sectarian institution, the Court found that the Baptist college in question was not pervasively sectarian inasmuch as "there are no religious qualifications for faculty membership or student admission, and that only 60% of the College student body is Baptist, a percentage roughly equivalent to the percentage of Baptists in that area of South Carolina." 413 U.S. at 743-44.

Notwithstanding the absence in *Hunt* of an explicit test for identifying a pervasively sectarian educational institution, the plurality opinion in *Roemer v. Bd. of Public Works of Md.*, 426 U.S. 736 (1976) set forth a profile of a pervasively sectarian educational institution for evaluating Establishment Clause claims. In *Roemer*, the Court considered an Establishment Clause challenge to the constitutionality of a Maryland statute providing public aid in the form of grants ("Sellinger grants") to colleges affiliated with the Roman Catholic Church. In *Roemer*, the plurality noted that "the focus of the debate" concerned whether the grant program had the primary effect of advancing religion and creating excessive church-state entanglement. As to the primary-effect question, the plurality in *Roemer* noted that "*Hunt* requires (1) that no state aid at all go to institutions that are so 'pervasively sectarian' that secular activities cannot be separated from sectarian ones, and (2) that if secular activities can be separated out, they alone may be funded." *Id*. at 755. In determining whether an institution was "pervasively

light least favorable to the non-moving party" in granting summary judgment in favor of Plaintiffs. Lipscomb's Br. at 7, n. 4. There is no merit to this claim because the district court based its decision on the undisputed facts in the record, which established as a matter of law that Lipscomb is a pervasively sectarian educational institution and that the loan transaction amounted to a direct economic benefit for Establishment Clause purposes.

## The profile of a pervasively sectarian educational institution

In evaluating whether Lipscomb is a pervasively sectarian institution, our attention should be directed in the first instance to *Hunt v. McNair*, 413 U.S. 734 (1973), since it is the only case dealing with the precise issue at hand that yielded a majority opinion. In *Hunt,* the Supreme Court also addressed the issue of state aid to a religious school in a challenge to the validity of the South Carolina Educational Facilities Authority Act ("the Act"), under which revenue bonds were issued to the Baptist College at Charleston, South Carolina, a Baptist-affiliated college. Through the issuance of the revenue bonds, the Act provided assistance to higher educational institutions in constructing and financing projects, such as buildings, facilities, and site preparation, specifically excepting "any facility used or to be used for sectarian instruction or as a place of religious worship nor any facility which is used or to be used primarily in connection with any part of the program of a school or department of divinity for any religious denomination." *Id*. at 736.

Applying the factors set forth in *Lemon*, the Court in *Hunt* held that the Act did not violate the Establishment Clause, finding in pertinent part that the statute did not have the primary effect of advancing or inhibiting religion insofar as the college did not have a significant sectarian orientation and the projects were limited to those with a secular purpose. In *Hunt*, the Supreme Court noted:

obtained by Lipscomb University is the same provided to private companies which create identical economic opportunities. The conduit financing advances a clear governmental, secular interest in promoting economic opportunity. Finally, the revenue bond program does not present the perception of government endorsement of religion.

Based on the foregoing, we **REVERSE** the district court grant of summary judgment for plaintiffs and **REVERSE** both the district court's denial of summary judgment for Metro and its denial of summary judgment to Lipscomb University.

———————

**DISSENT**

———————

CLAY, Circuit Judge, dissenting.     Because David Lipscomb University ("Lipscomb") is indisputably a "pervasively sectarian" educational institution and because the low-interest loan to Lipscomb through the issuance of the tax-exempt bonds by the Industrial Development Board ("the Board") amounted to a direct economic benefit in violation of the Establishment Clause of the First Amendment of the U.S. Constitution, I would find that the district court did not err in granting Plaintiffs' cross-motion for summary judgment, denying the separate motions for summary judgment filed by the Board and the Metropolitan Government ("Metro") and entering a permanent injunction prohibiting the Board and Metro from issuing additional tax-exempt bonds to Lipscomb or tax-exempt bonds to any pervasively sectarian institution.

As will be conclusively demonstrated below, Lipscomb fits the profile of a pervasively sectarian educational institution by imposing religious restrictions on student admissions and faculty and staff appointments; enforcing obedience to its religious dogma, which is the "supreme purpose" of the University; requiring daily Bible study and attendance at chapel as an integral part of its religious mission; and placing religious limitations on how and what the faculty teach. The low-interest loan of $15 million originated by the Board at Lipscomb's request constituted a direct economic benefit because it enabled Lipscomb to advance its sectarian mission by funding improvements to the University. Given its pervasively sectarian character, the direct economic benefit to Lipscomb results in excessive governmental entanglement with the religious mission of the University in violation of the Establishment Clause.

On appeal, Lipscomb first argues that the district court's grant of summary judgment in favor of Plaintiffs was erroneous because it rested upon a finding that Lipscomb is a pervasively sectarian educational institution. According to Lipscomb, "whether an institution is 'pervasively sectarian' is no longer a factor to be considered by the courts in these kinds of cases." Lipscomb's Br. at 7. However, as the majority opinion recognizes, the pervasively sectarian test has not been abandoned. In *Johnson v. Econ. Dev. Corp. of County of Oakland,* 241 F.3d 501, 510 n. 2 (6th Cir. 2001), this Court pointed out:

> The principle expressed in *Hunt v. McNair*, 413 U.S. 734 (1973), that government aid in the form of tax exempt revenue bonds of the type involved in this case violates the Establishment Clause--when provided to pervasively sectarian institutions--has not been disavowed, at least to my knowledge, by any subsequent majority opinion of the Supreme Court. *Accord Agostini v. Felton*, 521 U.S. 203, 233 (1997) (recognizing that under the Establishment Clause, the court must consider " 'the character and purposes of the institutions that are benefitted' . . . (e.g., whether the religious institutions were 'predominantly religious'")) (citing *Hunt*, 413 U.S. at 734-44).

241 F.3d at 510 n. 2 (parallel citations omitted.) Although the majority notes that the Court questioned "[t]he vitality of the pervasively sectarian test" in *Mitchell v. Helms*, 530 U.S. 793 (2000), we noted in *Johnson* that "it is Justice O'Connor's opinion [in *Mitchell*], which does not abolish the distinction between 'pervasively sectarian' and 'sectarian' institutions and which expressly declines to adopt Justice Thomas' expansive view, that is controlling upon this Court." *Id.*

Alternatively, Lipscomb claims that even if the pervasive sectarian test remains relevant, the district court's decision must be vacated and remanded for an evidentiary hearing because the court improperly "viewed ambiguous facts in a

## DISCUSSION

At the outset, it should be noted that Plaintiffs challenge only the constitutionality of the Tennessee statute as applied, which authorized the Board to issue tax-exempt bonds to Lipscomb or any other pervasively sectarian institution. Thus, the issue squarely presented on appeal is whether the low-interest loan by the Board to Lipscomb funded through the issuance of the tax-exempt bonds violates the Establishment Clause because Lipscomb is a pervasively sectarian educational institution and the loan amounts to direct state aid.

The point of departure for analyzing whether the low-interest loan to Lipscomb through the issuance of the tax-exempt bonds by the Board violated the Establishment Clause is the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971), as refined by the Court in *Agostini v. Felton*, 521 U.S. 203, 232-33 (1997), which merged the excessive government entanglement prong with the "primary effect" analysis. As the majority opinion notes, the *Lemon* test, as reformulated by *Agostini,* continues to have vitality. *See Zelman v. Simmons-Harris*, 122 S. Ct. 2460, 2476 (2002) (O'Connor, J. concurring opinion). In the present case, the question before us concerns whether the governmental action satisfies the "primary effect" test. Under this test, the Court in *Agostini* stated that the governmental aid is permissible if "it does not result in governmental indoctrination; define its recipients by reference to religion; or create an excessive entanglement." *Id*. at 234. In the matter before us, the specific issue is whether the governmental aid results in excessive entanglement. In assessing whether there is excessive entanglement, the Court in *Agostini* stated that "we have looked to 'the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority.'" *Id*. at 232 (quoting *Lemon*, 403 U.S. at 615).

## BACKGROUND

Before addressing the substantive issues, it is helpful to describe in detail the nature of Lipscomb, a private, not-for-profit religious corporation affiliated with the Churches of Christ, which was founded by David Lipscomb and James Harding in 1891 and originally incorporated under the name of "The Nashville Bible School."[1] Characterizing itself as a "small co-educational liberal arts university" with an enrollment of approximately 2,500 students, Lipscomb states that "its primary mission has been to integrate Christian faith and practice with academic excellence." Among the objectives of Lipscomb are "[t]o provide the very best in a Christian liberal arts education under the direction of Christian teachers in a distinctly Christian environment . . . [t]o train future leaders in the church . . . [and] . . . [t]o hold up Christ as the example to follow in every field of activity." (J.A. at 38, 1249.)

According to Lipscomb's corporate charter and the bylaws of the Board of Directors,

> The corporation was organized for the purpose of teaching the word of God and the various branches of the useful knowledge, commonly taught in institutions of learning for the following general purposes: the support of any literary or scientific undertaking, as a college or university with power to confer degrees, an academy, a debating society lyceum, the establishment of a library, the support of a historical society, the promotion of painting, music and the fine arts, the support of Board of Trade or Chamber of Commerce or other objects of like

---

[1] This portrayal of Lipscomb is largely based upon its own publications that date from the time that the Board approved Lipscomb's request for a loan financed by the issuance of $15 million in tax-exempt bonds. It should be noted that for the purposes of deciding the issue on appeal, there is nothing in the record to suggest that the current publications of Lipscomb are materially different in any relevant respect.

nature, the support of public worship, the building of churches and chapels and the maintenance of missionary undertakings.

(J.A. at 805, 829-30). To this end, the bylaws of Lipscomb state that "[t]he President, with the assistance of vice presidents and principals, shall maintain a Christian college that shall perpetuate the high Christian ideals inaugurated by Harding and Lipscomb, the founders of David Lipscomb College, in which the Bible is made the book of most importance." (J.A. at 830-31.)

As noted in the President's letter in the 1989-1990 edition of the Student Handbook: "[W]e have a sincere interest in the spiritual values of each student and faculty staff member. Lipscomb has been built on Christian ideas. Daily Bible study and chapel provide direction but only you can make the commitment to grow closer to God." (J.A. at 293.) Lipscomb's Faculty Handbook also provides:

> The mission of David Lipscomb University is to serve its students so that they may master knowledge and skills appropriate to them and become Christlike in attitude and behavior.

> It must be kept firmly in the consciousness of all connected with the institution – administration, faculty, students, and patrons – that Lipscomb is a *Christian school*. In the original appeal for support, written by David Lipscomb, it was made clear that the Bible was to be the foundation upon which all else would center:

> > The supreme purpose of the school shall be to teach the Bible as the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who will attend in a pure Bible Christianity, excluding from the faith all opinions and philosophies of men, and from the work and worship of the church of God all human

of its functions is subsumed in its religious mission, and that the $15 million dollars in tax-exempt revenue bonds had the impermissible effect of promoting religion as a matter of law. In support of their motion for summary judgment, Plaintiffs submitted a statement of the undisputed facts. Thereafter, on July 3, 2000, Lipscomb submitted its verified response to Plaintiffs' statement of undisputed material facts in support of their motion for summary judgment.

On October 24, 2000, the district court entered a memorandum and order granting Plaintiffs' cross-motion for summary judgment and denying Lipscomb and Metro's respective motions for summary judgment. The district court also issued a permanent injunction enjoining the Board and Metro from issuing any additional tax-exempt revenue bonds for the benefit of Lipscomb or any other pervasively sectarian institution. The district court further awarded Plaintiffs' nominal damages in the amount of $1.00 each and authorized attorneys' fees for Plaintiffs. Defendants then filed timely notices of appeal. Subsequently, Defendants filed a motion to stay further proceedings on the matter of attorneys' fee pending this appeal. On October 31, 2000, the district court granted the motion to stay proceedings on the attorneys' fee issue.

Metro also asked for a stay of the permanent injunction issued by the district court enjoining the Board and the Metro from issuing any additional tax-exempt revenue bonds for the benefit of Lipscomb or any other pervasively sectarian institution. On July 13, 2001, the district court denied Metro's motion for a stay pending appeal. Thereafter, in a motion filed on August 13, 2001, Metro appealed the district court's denial of its motion for a stay pending appeal. In an order entered on September 25, 2001, this Court denied the motion for a stay pending appeal.

at public hearings and meetings of the Board held on April 10, April 16, and May 30, 1990.[4] At the meetings, Plaintiffs or their representatives complained that the issuance of the tax-exempt bonds for Lipscomb provided governmental support to a pervasively sectarian institution in violation of the Establishment Clause of the First Amendment of the U.S. Constitution. On May 30, 1991, Plaintiffs, as municipal taxpayers, commenced the instant action, challenging the validity of the Board's action in issuing tax-exempt revenue bonds for the benefit of Lipscomb.

Eventually, on October 9, 1998, Metro and Lipscomb separately moved for summary judgment, alleging that the issuance of the tax-exempt revenue bonds did not violate the Establishment Clause. In support of their respective motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, both Metro and Lipscomb submitted separate statements of the undisputed material facts on October 9, 1998 and October 16, 1998, respectively. Plaintiffs responded to Defendants' statements of the undisputed material facts and filed documents in opposition to Defendants' motions for summary judgment. Plaintiffs also filed a statement of additional undisputed material facts in opposition to Defendants' motions on November 9, 1998. Both Defendants then responded to Plaintiffs' statement of additional undisputed material facts on November 20, 1998 and December 2, 1998, respectively.

At oral argument on May 10, 2000, the district court requested that Plaintiffs submit a cross-motion for summary judgment. Pursuant to the district court's order, Plaintiffs filed a motion for summary judgment on May 30, 2000, alleging that the issuance of the tax-exempt revenue bonds to Lipscomb violated the Establishment Clause because Lipscomb is so pervasively sectarian that a substantial portion

---

[4]The lead Plaintiff, Harold E. Steele, is no longer a party as a result of his death on April 1, 1998.

inventions and devices. Such other branches of learning may be added as will aid in the understanding and teaching of the Scriptures and as will promote usefulness and good citizenship among men.

(J.A. at 1627.) (emphasis in original.) The Faculty Handbook continues by stating,

This purpose was further set forth in the deed conveying the property on Spruce Street for the use of the school as follows:

. . . that the property shall be used for maintaining a school in which, in addition to other branches of learning, the Bible as the recorded will of God and the only standard of faith and practice in religion, excluding all human systems and opinions and all innovations, inventions, and devices of men from the service and worship of God, shall be taught as a regular daily study to all who shall attend said school and for no other purpose inconsistent with this object. The condition being herein inserted at the request of the founders of the proposed Bible School, the same is hereby declared fundamental and shall adhere to the premises conveyed as an imperative restriction upon their use so long as the same shall be owned by said Bible School, or its Trustees, and to any and all property which may be purchased with the proceeds of said premises in case of sale or reinvestment, as hereinafter provided.

David Lipscomb University is not, therefore, merely an institution which requires every student to take a lesson in the Bible each day; this study is the wellspring from which the university issued.

(J.A. at 1627-28.)

These ideas about the central importance of the Bible are echoed throughout Lipscomb's catalogues. For example, in the university catalogue for 1988-1989, Lipscomb states:

The Bible has always been considered the most important area of study for all students at DLC [David Lipscomb College]. The founders and those who have followed them have held it to be important that every student study the Bible in a class every day. Whatever one's major interest or life work, a thorough knowledge of the biblical life principles is needed.

In daily classes the Bible is taught as the inspired word of God. With the Bible itself as the text, students are encouraged to apply the Bible principles of right living to all aspects of personal and professional life.

In view of the daily Bible classes, it can be said that every Lipscomb graduate unofficially "majors in Bible." Those who formally major in Bible may give special emphasis in one of the following areas: Biblical Languages, Missions, Preaching, Religious Education, or Youth Ministry.

(J.A. at 41-42.) These points are reinforced in the 1990-1991 university catalogue:

**The Daily Bible Requirement**

The supreme purpose of David Lipscomb University is "to teach the Bible as the revealed will of God to man and as the only and sufficient rule of faith and practice, and to train those who will attend in a pure Bible Christianity." To help fulfill this purpose, each regular student must be enrolled in a Bible class each school day and also attend daily chapel services.

Every college or university has a right and even an obligation to be unique and distinctive based upon its

equip a new library; renovate and convert the old library into administrative offices; construct an intramural building (or student activity center), an intramural field, four new tennis courts, and a baseball stadium; construct an addition to the Swang Business Center; make parking, landscaping and walkway improvements; and acquire computer and fiber optic equipment.

At a public meeting on April 10, 1990, the Board approved Lipscomb's request for the loan, which was financed by the issuance of $15 million in tax-exempt industrial development bonds, pursuant to the Board's authority under Tenn. Code Ann. § 7-53-101(11)(A)(vii). After another public hearing on May 30, 1990, the Board formally approved the issuance of the bonds. On May 31, 1990, Nashville Mayor Bill Boner approved the issuance of the bonds, as required for tax-exempt status under 26 U.S.C. § 147(f), thus certifying that the bonds served a public purpose.

The tax-exempt bonds were then sold to private investors (bondholders), and the proceeds from the bonds were loaned to Lipscomb, pursuant to the loan documents. According to the loan agreement, Lipscomb was not to use the project funds for sectarian instruction or religious worship. Lipscomb is also obligated to pay all sums due on the bonds. In January of 1991, the bonds were replaced by revenue refunding bonds titled "Educational Facilities Revenue Refunding Bonds, Series 1991."

Defendant Sovran Bank, as trustee for the bondholders, was assigned the loan documents. Sovran Bank provided the principal security for the bonds through a $15,969,453 irrevocable letter of credit for the account of Lipscomb to Sovran Bank, N.A. as trustee for the bondholders. Additional security was provided by a promissory note and loan agreement entered into by Lipscomb and the Board.

Plaintiffs are state and local taxpayers residing in Davidson County, Tennessee, who objected to the issuance of the bonds

members of the Churches of Christ, particularly during chapel service. (J.A. at 1606-07.) Moreover, while Lipscomb provided its students with a list of local churches in the community, it only named those affiliated with the Churches of Christ. (J.A. at 835-36.) Lipscomb also acknowledges that it prohibits students from dancing, consuming alcohol, using tobacco, among other things, because it regards such conduct as being "un-Christian conduct." (J.A. at 308-309, 835, 1191-92, 1472-74.)

In response to recommendations made by the Southern Association of Colleges and Schools, Lipscomb undertook a major development project in the early 1990s to expand and renovate its campus to accommodate an increase in undergraduate enrollment to 3,000. To fund the project, Lipscomb applied for a $15 million, low-interest loan from the Board.[3] Lipscomb requested funding to construct and

---

[3]The Board is a public corporation created under the authority of Tenn. Code Ann. § 7-53-101 - § 7-53-311. Metro approved the creation of the Board by resolution as provided in Tenn. Code Ann. § 7-53-201. By law, all amendments to the corporate charter of the Board must also be approved by Metro. Tenn. Code Ann. § 7-53-204 (1985). Under the statute, the Board has the authority to enter into loan agreements with third parties; it can sue and be sued; it can sell any of its properties; it can issue bonds and borrow money from banks and other financial institutions by issuing notes. Tenn. Code Ann. § 7-53-204. In addition, the Board has the authority to issue tax-exempt revenue bonds for various public work projects, including

> [a]ny nonprofit educational institution in any manner related to or in furtherance of the educational purposes of the institution, including, but not limited to classroom, laboratory, housing, administrative, physical education and medical research and treatment facilities.

Tenn. Code Ann. § 7-53-101(11)(A)(vii)(1990 Supp.). After the approval and sale of the tax-exempt bonds under the statute, the municipal governments that approve them are not liable for repayment of the debt. Tenn. Code Ann. § 7-53-306 (1985).

individual purpose. Few, if any, other colleges today require students to take regular daily classes in Bible study. Students who choose to attend David Lipscomb University should be interested and supportive of the daily Bible requirement. The university has no authority to suspend this requirement for any student.

(J.A. at 1253.) Lipscomb's 1990-91 catalogue further provides:

Although the daily Bible requirement is important enough to be listed as a separate part of each student's academic program, it is also considered an integral part of the general education program at David Lipscomb College. No body of knowledge or study of any kind is as important as the study of the Bible itself.

(J.A. at 41, 1254.)

Accordingly, taking and passing a daily Bible class is a "fundamental requirement for attendance" at Lipscomb. (J.A. at 39-40.) As set forth in Lipscomb's student bulletin for 1991-92:

The Bible has always been considered the most important area of study for all students at David Lipscomb University. The founders, and those who have followed them, have held it to be important that every student study the Bible. Whatever their major interest or life work, a thorough knowledge of Biblical principles is needed.

In daily classes, Bible is taught as the inspired word of God. Students are encouraged to apply the Bible principles of right living to all aspects of personal and professional life.

(J.A. at 836-37, 1260.)  These ideas were continually expressed in the editions of the Student Handbook from 1988 through 1992:

Because the Bible is the heart of Lipscomb's curriculum, every regular student studies the Bible every school day.  Offerings in the Department of Bible are arranged so that a student can, in four years, have exposure to the entire Bible.

Any student who fails Bible is automatically placed on probation for the succeeding semester.  Probation must be removed by passing each Bible course carried during the semester of probation.  Failure to meet this requirement means that the student will be dropped at the end of the semester.

(J.A. at 303, 1189, 1212, 1235.)  As explained by Dr. Joe Mac Lynn, the head of Lipscomb's Bible Department, each student is required to have two credit hours of Bible each semester in order to graduate from Lipscomb.  (J.A. at 1504-5.)  From 1988 until September 1992, approximately 100 undergraduate students were on "Bible probation."  (J.A. at 834.)  As noted in the Student Handbooks, students who do not pass every Bible course carried while on probation are subject to dismissal from the school.

In addition to daily Bible study, Lipscomb also requires every full-time student to attend chapel each school day.  (J.A. at 833.)  As stated in Lipscomb's Faculty Handbook:

Chapel

The heart of each day's activities at David Lipscomb University is the chapel service.  It is here that the entire Lipscomb family gains strength and inspiration for the tasks of the day.  *Since attendance at chapel is compulsory for all students, it is expected that each faculty member will attend chapel regularly.*  No

after my discovery deposition in the case of *Steele v. Industrial Development Board, et al.* and I was thinking about these issues.)  He told how he required the students in his David Lipscomb University sociology class called "The Family" to answer a question on Ephesians 5.  The question was whether they accepted the doctrine that a man must be "head" of the wife.  He was shocked and upset that one of his students had once actually said she didn't agree with the scripture.  He cited this incident as proof of "the rising tide of immorality."  He did not state whether he graded the student poorly.

(J.A. at 622.)

During the years from 1990 to 1992, at the time of the issuance of the bonds, more than 77% of the undergraduate students at Lipscomb were members of the Churches of Christ.  (J.A. at 837, 1181.)  According to the affidavit of W. Craig Bledsoe, the Provost at Lipscomb since 1997, 78.97% of the student body indicated that they were members of the Churches of Christ in 1991, while 71.42% of the student body so indicated in 1997.  (J.A. at 502.)  Student applications for admission to Lipscomb during these years "required a character reference from a minister, youth minister or leader at church," without specifying the denomination of the church or the religion.  (J.A. at 837.)  As expressed in a brochure from Lipscomb, "[o]ne common thread that binds students together is their commitment to Christ.  At Lipscomb a student's love for the Lord is strengthened by this special association with other students, the majority of whom share the same spiritual values."  (J.A. at 1635.)  In his affidavit, Bledsoe also stated that "there are numerous other religions represented in the student body including, for example, Buddhism, Lutheran, Muslim, Russian Orthodox, Hindu, Catholic, Mormon, Baptist, and Nazarene."  (J.A. at 502).  In his supplemental affidavit, Bledsoe averred that "Lipscomb does not discriminate against students on the basis of religion."  (J.A. at 775.)  Nevertheless, Dr. Sinclair testified in her deposition that students were pressured to become

(J.A. at 1305.)    Under the subheading of "Academic Freedom," the Faculty Handbook adds:

Each member of the Lipscomb faculty is committed both by personal conviction and by contract to the purposes and ideals of the institution as set forth by the founders and Board of Directors. Within this framework each teacher is free to pursue and teach truth in his/her respective field of learning. Since truth is consistent everywhere, this basic commitment makes possible academic freedom without the necessity of a formal statement.

(J.A. at 1305.) According to Dr. Sinclair, who has had a long association with Lipscomb in addition to teaching there, the administration at Lipscomb directed members of the faculty to teach certain religious doctrines or views in courses given in the Biology and Physics Departments, where faculty members are "instructed to teach creationism." (J.A. at 1616-17.) In her affidavit, Dr. Sinclair also stated:

5.  Those who are not familiar with the church of Christ have difficulty understanding the restrictive nature of its beliefs. The Bible is taken very literally and very restrictively. For example, women are not allowed to hold any leadership positions of any kind. Women are not allowed to speak in any worship service. Women are not allowed to lead singing, to make announcements or to teach in any group where men are present. Women are not allowed to go to business meetings of the church. Women have no vote in any meetings; women have no say in how the money collected is spent. Women are taught to "be in submission" at home and in the church.

6.  In order to see how this doctrine affects teaching and academic freedom at Lipscomb, I recall a speech Hollis Todd, professor of the sociology department at Lipscomb and an elder at my church gave on November 22, 1992. (I took notes on it because it was a few days

arrangements should be made which require regular chapel absences of one or more times each week without prior written approval of the dean.

(J.A. at 1401.) (emphasis in original.) As set forth in the editions of the Student Handbook from 1988 through 1992, a student with eleven absences from chapel during a semester is placed on "chapel probation." (J.A. at 303, 1189-90, 1212-13, 1235-36.) From 1990 through 1992, an average of 40 to 60 students were on "chapel probation" each semester. (J.A. at 833, 1463.) The Student Handbooks also provide that "[i]f flagrant disregard for chapel attendance persists, a student is subject to immediate suspension." (J.A. at 304.) In his deposition, Dr. Dennis Loyd, the Dean of Students at Lipscomb, testified that every full-time student "knows he goes to chapel," and that failure to do so results in dismissal. (J.A. at 1455-59.)

As stated in the bylaws of the Board of Directors, each director at Lipscomb must be a member of the Churches of Christ in good standing in the congregation. (J.A. at 110.) The Board of Directors elects the president to be its chief executive officer in charge of "its business and Christian education affairs." (J.A. at 115.) The bylaws also provide that "great care should be exercised in the selection and development of [] teaching personnel." (J.A. at 116.) Moreover, all personnel, with the exception of employees of its services, building and grounds departments, shall be members in good standing of the Churches of Christ. (J.A. at 832.) Lipscomb also reserves the right under Title VII of the Civil Rights Act of 1964 (as amended) to discriminate, "where it is necessitated by the specific religious tenets held by the institution." (J.A. at 834, 1250.)

In addition, Lipscomb President Harold Hazelip acknowledged in his deposition testimony that all of its faculty must be members in good standing of the Churches of Christ, and that leaving the church is grounds for termination of employment. (J.A. at 1167, 1169.) In a letter to Nashville

Mayor Boner opposing the bond issue, Norman Parks, the former dean of Lipscomb, remarked:

> No person can be employed at Lipscomb who is not a member of the mainline Church of Christ.  He cannot be a premillennialist or believe that instrumental music is acceptable for worship of God.  He must believe that a divorced person cannot remarry and continue in church.  He must believe that a woman cannot teach a class in religion to men.

(J.A. at 1142.)   In this regard, Dr. Lynn, the head of Lipscomb's Bible Department, testified in his deposition that a divorced teacher may be allowed to remain as a teacher at the university, but "[a] person who divorces and remarries during the [] employment relationship to [sic] the University would be subject to discipline or to dismissal." (J.A. at 1539.) According to Dr. Susan Dennison Sinclair, she was informed by the department chairman when she was hired as an adjunct professor in the English Department for one semester in 1990 that "he would not be allowed to recommend me based on various personal questions, one of them being the fact that my husband and I at that time were separated." (J.A. at 1572.) Dr. Sinclair also testified that the chairman of the English Department informed her when she was hired that "there might be some problems, with the requirements of the university" by her failure to answer the question on the employment application concerning drinking. (J.A. at 566-67.)

Lipscomb also imposes religious restrictions on how and what the faculty teach.  Specifically, Lipscomb admits that it does not subscribe to the American Association of University

Professors' ("AAUP") Statement of Principles on Academic Freedom.[2]  In contrast, Lipscomb's Faculty Handbook states:

> In the final analysis, the worth of any educational institution is determined by its faculty.  It is of special importance in the Christian university that every teacher be first dedicated to Christ and His truth, demonstrating those qualities of heart and life which will inspire young people to love the Lord and strive to please Him.  This devotion must be accompanied by sound scholarship, awareness of student needs, and a determined desire to serve.

---

[2]The AAUP's principles provide:

a.   Teachers are entitled to full freedom in research and in the publication of the results, subject to the adequate performance of their other academic duties; but research for pecuniary return should be based upon an understanding with the authorities of the institution.

b.   Teachers are entitled to freedom in the classroom in discussing their subject, but they should be careful not to introduce into their teaching controversial matter which has no relation to their subject.  Limitations of academic freedom because of religious or other aims of the institution should be clearly stated in writing at the time of the appointment.

c.   College and university teachers are citizens, members of a learned profession, and officers of an educational institution.  When they speak or write as citizens, they should be free from institutional censorship or discipline, but their special position in the community imposes special obligations.  As scholars and educational officers, they should remember that the public may judge their profession and their institution by their utterances.  Hence they should at all times be accurate, should exercise appropriate restraint, should show respect for the opinions of others, and should make every effort to indicate that they are not speaking for the institution.

(J.A. at 689.)